**Eric Charles NENNO, Appellant,**

v.

**The STATE of Texas**

No. 72313.

Court of Criminal Appeals of Texas.

June 24, 1998.

Brian W. Wice, Houston, for appellant.

Carol M. Cameron, Assistant District Attorney, Houston, Matthew Paul, State's Attorney, Austin, for State.

*OPINION*

KELLER, Judge, delivered the opinion of the Court in which McCORMICK, Presiding Judge, and MEYERS, MANSFIELD, HOLLAND, and WOMACK, Judges, joined.

Appellant was convicted in January 1996 of capital murder, committed on or about

March 23, 1995. Tex. Penal Code § 19.03(a)(2).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises nineteen points of error. We will affirm.

## A. SUFFICIENCY OF THE EVIDENCE

### 1. Future dangerousness

 In point of error two, appellant contends that the evidence is legally insufficient to support the jury's answer to the future dangerousness special issue.[3] A legal sufficiency review of that issue is governed by the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); the question is whether, in the light most favorable to the prosecution, any rational trier of fact could have returned an affirmative answer. *Moore v. State*, 935 S.W.2d 124, 126 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1711, 137 L.Ed.2d 835 (1997). The facts of the offense, alone, can be sufficient to support an affirmative answer to the special issue. *Walbey v. State*, 926 S.W.2d 307, 310 (Tex.Crim.App. 1996).

The facts of the present offense were egregious. Appellant raped and choked to death a seven-year-old girl. However, we need not determine whether such facts, by themselves, would support an affirmative answer to the future dangerousness issue. The State also presented expert testimony that appellant would be a threat to society. This testimony came from Kenneth Lanning, a Supervisory Special Agent in the Behavioral Science unit of the FBI who specialized in studying the sexual victimization of children. From information given about appellant, Lanning concluded that appellant was a pedophile. Lanning testified that such a person was difficult to rehabilitate. After being given a lengthy hypothetical matching the facts shown by the evidence, Lanning testified that an individual matching the hypothetical "would be an extreme threat to society and especially children within his age preference." This evidence, along with the circumstances of the crime, is sufficient for a rational jury to conclude that appellant poses a future danger to society. Point of error two is overruled.

### 2. Mitigation

 In point of error three, appellant contends that the evidence is legally insufficient to support the jury's answer to the mitigation special issue.[4] But this Court does not conduct a sufficiency review of that issue. *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim.App.1998). Point of error three is overruled.

## B. GUILT/INNOCENCE

### 1. Motion to suppress

In point of error ten, appellant contends that the trial court erred in failing to draft findings of fact and conclusions of law regarding his motion to suppress. We granted the State's motion to abate, and the case was remanded to the trial court to make such written findings and conclusions. The trial court has done so, and the written findings and conclusions have been forwarded to this Court as a supplemental transcript. Because appellant obtained the appropriate relief on this matter, point of error ten is now moot.

---

1. § 19.03(a)(2) provides that a person commits capital murder when he commits murder under § 19.02(b)(1) and "the person intentionally commits the murder in the course of committing or attempting to commit ... aggravated sexual assault" (ellipsis inserted).

2. Unless otherwise indicated all future references to Articles refer to Code of Criminal Procedure.

3. The issue asks: "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071 § 2(b)(1).

4. That issue asks: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. Article 37.071 § 2(e).

In points of error seventeen through nineteen, appellant contends that the trial court erred in overruling his motion to suppress. He contends that the trial court's admission of his oral statements to Detective Taber violated Article 38.22 and that his oral and written statements were involuntary under the United States Constitution.

### a. *Facts* [5]

Detective Johnson received the defendant's name as a possible suspect and referred it to Detectives Wedgeworth and Taber for a follow-up investigation. Detectives Wedgeworth and Taber went to the defendant's home at 17602 Bullis Gap several times on the afternoon of March 25, 1995. The defendant lived one to one-and-a-half blocks from where the complainant had last been seen. On the third visit, the defendant—dressed only in a white bath towel around his waist—finally answered the door. The defendant indicated he was willing to talk about the missing child and permitted the detectives to come inside. The defendant appeared very cooperative and willing to talk. When asked whether he knew the child, the defendant became visibly nervous and shook and denied knowing or seeing her ever before. The defendant permitted the detectives to search his house and Detective Wedgeworth conducted a superficial search but found nothing out of the ordinary.

The detectives asked the defendant why somebody in the neighborhood asked for him to be checked out and the defendant replied there was an incident in the spring when he was accused of attempting to lure a child into his house and pull off her pants. The defendant was visibly shaking and appeared extremely nervous. Detectives Wedgeworth and Taber visited with the defendant at his house for a total of approximately ten minutes. The detectives then asked the defendant if he would come to the command post and make a written statement and the defendant stated he had no problem with that. The detectives informed the defendant that several blocks away a trailer had been set up as a command post. The detectives then returned to the command post. The detectives made no promises or threats to the defendant during this initial encounter.

Five to ten minutes later, the defendant arrived at the command post. Detective Taber led the defendant into a small interview room. Detective Taber read the defendant the following rights from the blue card provided by the Harris County District Attorney's Office:

> You have the right to remain silent and not make any statement at all. Any statement you make may be used against you and probably will be used against you at your trial. You have a right to have an attorney present to advise you prior to and during any questioning. If you're unable to hire a lawyer, you have the right to have a lawyer appointed to advise you prior to or during any questioning. You may terminate the interview at any time.

Detective Taber asked the defendant if he understood the warnings and the defendant indicated he understood. Detective Taber asked the defendant if he wanted to waive his rights and talk about the missing child and the defendant agreed to talk to the detectives. The defendant appeared to understand the course of the conversation. The conversation was relaxed, very soft-spoken, and very low-tone. Detective Taber spoke with the defendant for approximately an hour. During the interview, the defendant was offered something to eat and drink. Detective Taber made it clear from the beginning that the defendant was not under arrest and that he could go at any time.

When Detective Taber asked the defendant if he knew why he was there, the defendant replied: "You think I'm a suspect in the little girl case where she's missing." Detective Taber asked the defendant why he thought he would be a suspect; the defendant stated because of his past incident involving trying to get a little girl in the residence and removing her pants and because he liked children. When asked what the defendant had done the night the complain-

---

**5.** The trial court's findings of fact are in narrative form. Except for summarizing the consent to search portions, this "Facts" subsection consists of relevant excerpts of the trial court's findings set out verbatim. Our review shows that the findings are sufficiently supported by the record.

ant had disappeared, the defendant stated he arrived home, changed clothes, went outside, talked to his neighbor, and then went inside. The defendant stated he had had a six-pack of beer. When asked if there was any reason why a neighbor would say they had seen the defendant on the same street from which the complainant had disappeared, the defendant responded: "Well, maybe I could have been outside my house by the fence, but I just don't remember." Detective Taber asked the defendant again the same question about would it have been possible for him to have been down the street and if he had heard about the missing girl; the defendant stated: "Well, it might have been possible but I don't remember."

Detective Taber asked the defendant what he thought had happened to the child and the defendant said he thought somebody had kidnapped, raped, and killed her. Detective Taber asked the defendant what kind of person he thought would do something like that to a little girl and the defendant said someone like him. When asked why he responded in that manner, the defendant answered because of the other incident, the other child, that he had always thought about being with children and that he had fantasized about them sexually. The defendant said he fantasized or dreamed about a former girlfriend and her child and teaching the child about sex and having sex with the child. The defendant stated he masturbated several times a week while fantasizing and masturbated while looking at the neighborhood children through his window.

Detective Taber asked the defendant what he thought someone would do with the body of a child if they had killed the child. The defendant said that after they were finished with the body of the child, the person would probably take the child and dump their body on a construction site on 290 just before Hockley and dump the child's clothes at another location. When asked whether he had ever thought about doing something like that, the defendant stated he had thought about it before but he had never done it. Detective Taber asked the defendant what he thought should happen to a person responsible for attacking a little girl and the defen-

dant said the person should be put to death. Detective Taber asked the defendant what he thought the result of the police investigation would turn up and the defendant said it didn't look good for him right now but he hoped that everything would turn out all right.

Detective Taber asked the defendant if he were the detective how would he pursue the investigation. The defendant stated he would look for somebody in the neighborhood, somebody close by who knew the child and liked children, and he would concentrate on them. When asked directly whether he had taken, or was involved in taking, the complainant, the defendant denied it. The defendant never directly incriminated himself. The defendant was free to leave. No promises or threats had been made to the defendant.

Detective Taber asked the defendant if he would take a polygraph examination and he said: "Sure, I'll take a polygraph." Detective Taber asked the defendant how he thought the polygraph would turn out and the defendant said he hoped it would turn out all right. Detective Taber terminated his interview with the defendant.

Special Agent Young asked the defendant if he was willing to cooperate. Special Agent Young explained the polygraph examination and the defendant's right to refuse. The defendant said it would be no problem and that he would take a polygraph examination. Officers then made arrangements for a polygraph examination. Appellant also executed a consent to search his residence. Officers searched the residence but found nothing of value to the investigation.

Lt. Raney, a licensed polygraph examiner, met the defendant at approximately 9:30 p.m. at the command post. Lt. Raney conducted a two-and-one-half hour pre-test interview. Lt. Raney reviewed the standard Texas Polygraph Examination Release Form, State's Exhibit 6, which the defendant voluntarily signed and which states: "I, Eric Charles Nenno, voluntarily, without threats, duress, coercion, force, promises of immunity or reward, agree and stipulate to take a polygraph examination, lie detector test, for the mutual benefit of myself and the Harris County

Sheriff's Department." Lt. Raney informed the defendant that the purpose of the examination is to measure and test him to find out if he has any knowledge or involvement in the disappearance of the complainant. The defendant asked no questions and indicated he understood. The defendant indicated he had not consumed alcohol or smoked marijuana. The defendant appeared cooperative. The defendant never indicated that he wanted to conclude the interview; if he had, the defendant would have been allowed to leave. Lt. Raney testified the defendant was not in his custody.

Lt. Raney administered the polygraph examination at approximately 1:00 a.m. and it lasted thirty minutes. Lt. Raney explained the examination process and placed attachments on the defendant. The defendant made no complaints and cooperated. Lt. Taney read the charts and found there had been numerous deceptions in the polygraph examination and the defendant had failed the examination on the relevant issue questions but said nothing to the defendant. The defendant eventually said: "I failed it, didn't I?" Lt. Raney told the defendant: "Yes, you had some difficulty on it" and that he was going to have to tell the police where the body was. Lt. Raney reminded the defendant that he had told him prior to the examination that when the defendant finished the examination he would know whether or not the defendant was telling the truth. Lt. Raney told the defendant the examination indicated deception when the defendant had been asked if he knew the complainant was missing before he had been told about it Friday morning. Lt. Raney told the defendant he needed to tell where the complainant is because he knows. The defendant stated: "I think she's still in the attic." When asked further, the defendant stated: "They're going to kill me for this, aren't they?"

Lt. Raney asked for further details and the defendant stated he had taken the complainant to his bedroom and attempted to have sex with her but could not and he strangled her and then had sex with her. The defendant asked: "Is there anything here, anything you can give me, that I can take my life with?" and Lt. Raney said no. Lt. Raney made no threats or promises to the defendant during their encounter.

After waiving his rights, appellant executed a second consent to search his residence. He accompanied officers to his home, the victim's body was recovered, and appellant was arrested.

At 2:30 a.m., Special Agent Young advised the defendant of his rights from his Federal Bureau of Investigations form, State's Exhibit 3, which reads as follows:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

The defendant said he understood his rights. The defendant did not ask Special Agent Young to explain anything nor did he ask for an attorney. The defendant appeared cooperative and willing to talk. The defendant freely and voluntarily signed the following waiver of rights:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

The defendant did not ask any questions nor ask to terminate the interview.

Detective Johnson asked the defendant if he were willing to give a written statement and the defendant agreed. State's Exhibit 4 is captioned: "Statement of Person in Custo-

dy of Eric Charles Nenno" and is dated March 26, 1995, at 2:50 a.m., and recites:

PRIOR TO MAKING THIS STATEMENT I HAVE BEEN WARNED BY DETECTIVE JOHNSON, THE PERSON TO WHOM THIS STATEMENT IS MADE THAT:

1) I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL AND ANY STATEMENT I MAKE MAY AND PROBABLY WILL BE USED AGAINST ME AT MY TRIAL;

2) ANY STATEMENT I MAKE MAY BE USED AS EVIDENCE AGAINST ME IN COURT;

3) I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING;

4) IF I AM UNABLE TO EMPLOY A LAWYER I HAVE THE RIGHT TO HAVE A LAWYER APPOINTED TO ADVISE ME PRIOR TO AND DURING ANY QUESTIONING; AND

5) I HAVE THE RIGHT TO TERMINATE THIS INTERVIEW AT ANY TIME.

PRIOR TO AND DURING THE MAKING OF THIS STATEMENT I KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE THE RIGHTS SET OUT ABOVE AND MAKE THE FOLLOWING VOLUNTARY STATEMENT.

The defendant initialed each of the above written warnings, the above written waiver, and each of the paragraphs of his statement.

Detective Johnson asked the defendant questions, he answered, and Detective Johnson typed what the defendant said into a laptop computer. Detective Johnson, Special Agent Young, and the defendant were present in the interview room. The defendant never asked to terminate the interview. The defendant never asked for an attorney. Neither Detective Johnson nor Special Agent Young promised or threatened the defendant. The defendant never appeared hesitant about giving the statement. The defendant indicated he wanted to give an accurate and truthful statement. The defendant appeared to give a logical and chronological narration of the events. The defendant did not hesitate to sign the statement. The defendant freely and voluntarily waived his rights and signed the Statement at 4:45 a.m.

#### b. *Article 38.22*

■ Appellant contends that Detective Taber's testimony regarding oral statements made by appellant are inadmissible under Article 38.22 because appellant was in custody and because the exception in Article 38.22 § (3)(c) does not apply. § 3(c) provides circumstances in which an oral statement may be admissible if the admissibility requirements in § 3(a) are not met. Appellant does not, however, explain which requirement contained in § 3(a)(1)-(5) was not complied with. The trial court makes no reference to any electronic recording of appellant's statements even though that is a requirement under § 3(a)(1). Assuming without deciding that no electronic recording was made, we find that appellant's claim must nevertheless fail.[6]

■ Appellant concedes, as he must, that Article 38.22 applies only to persons in custody. *See* Article 38.22 § 5. "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996)(citing *Stansbury v. California*, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). "The reasonable person standard presupposes an *innocent* person." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991))(emphasis in original).

The trial court's findings show that appellant was not in custody. Appellant was never told, before or during his interviews with Detective Taber, that he was in custody; in fact, he was told at the beginning of the

---

6. Due to our disposition of this point of error, we need not attempt to determine whether an electronic recording was actually made. Nor do we need to determine whether appellant has inadequately briefed his claim by failing to allege and provide record support for the State's failure to satisfy one of the requirements outlined in § 3(a)(1)-(5).

command post interview that he was *not* in custody. Any finding of custody would have to be inferred from the combination of circumstances present. We inferred custody in *Dowthitt* when the circumstances consisted of: (1) a very long time period during which interrogation occurred, (2) the exercise of police control over the defendant, and (3) the manifestation of probable cause after the defendant admitted to being present at the scene of the crime. 931 S.W.2d at 257. None of the factors present in *Dowthitt* are present in the case at bar. The time period of interrogation was short: appellant had been subject to questioning at the command post for only an hour after he was told he was not under arrest. No element of coercion or control appears in the record. When officers arrived at appellant's door, they were simply following one of many leads in the investigation. They did not indicate that appellant had to come to the command post, but merely asked him to go. The officers left for the command post *without* appellant, who followed on his own about ten minutes later. Unlike in *Dowthitt,* in the present case, there is no evidence that officers attempted to restrict appellant's movements at the command post or that they ignored any requests made by him. Finally, although appellant made a number of suspicious statements during the command post interview, he denied having any connection to or involvement in the offense. A reasonable person in appellant's position would not have believed he was restrained to the degree associated with a formal arrest. Hence, appellant was not in custody when he made oral statements to Detective Taber.

■ Appellant next contends that his oral statements to Detective Taber and his written statement were involuntary. To determine whether the circumstances render an accused's statement involuntary, we ultimately must determine whether his will was "overborne" by police coercion. *Armstrong v. State,* 718 S.W.2d 686, 693 (Tex.Crim.App. 1985). Relevant circumstances with regard to this question include the "length of detention, incommunicado or prolonged detention, denying a family access to a defendant, refusing a defendant's request to telephone a lawyer or family, and physical brutality." *Id.*

The present case includes none of the factors listed in *Armstrong.* In fact, aside from the two complained-of comments from the polygraph operator (addressed below) the record contains no evidence of coercion, even of a subtle nature. Appellant suggests that some evidence of police coercion was shown because one of the law enforcement officers briefly showed a firearm and because the authorities apprised appellant that they wanted him to answer questions about the disappearance and likely death of an seven-year-old girl. We find that suggestion completely untenable. Further, appellant contends that the record is silent about whether he was ever apprised of the seriousness of the crime. But the record clearly shows that appellant was aware he could receive the death penalty for his crime.

Appellant also contends that the polygraph examiner made two comments that, alone or in combination with other factors, rendered his written statement involuntary. These comments occurred after his oral statements to Detective Taber; therefore, the comments could not have contributed to the involuntariness of those statements. Because there is no evidence in the record that even remotely suggests that the oral statements were involuntary, we dispense with that aspect of appellant's arguments and focus on his written statement.

■ Appellant contends that, before the polygraph examination, Lt. Raney told him that the results could be used "for his benefit as well as for the benefit of the [police]." Appellant claims that this warning is prohibited under *Dunn v. State,* 721 S.W.2d 325 (Tex.Crim.App.1986) and rendered his written confession inadmissible as involuntary. But *Dunn*'s holding regarding the use of "for or against" language is a construction of Article 38.22 rather than a constitutional rule of involuntariness. *Creager v. State,* 952 S.W.2d 852, 855 (Tex.Crim.App.1997). A statement is inadmissible if the statutorily required warning that "any statement he makes may be used against him" is altered into a warning that says that the statement may be used "for or against" him. But, when the correct statutory warning is given,

and a "for or against" type comment is made at a different time during the course of interrogation, no statutory violation is present. *Id.* Such a remark may be a circumstance bearing upon the voluntariness of a defendant's statement, but does not necessarily render the statement inadmissible. *Id.* In the present case, the proper warning was given a number of times, both before and after the complained-of comment by the polygraph operator. The correct warning is set out in the written warnings contained in appellant's written statement. While the polygraph operator's comment is a factor to take into account in a voluntariness analysis, it does not in itself require an involuntariness finding.

■ Appellant also contends that the polygraph operator coerced his confession by commanding him to tell the police what happened. We do not, however, interpret the polygraph operator's comment that appellant would "have to tell" the police what happened as meaning that he was legally obligated to do so. Instead, the polygraph operator's statement conveys that appellant was morally obligated to give the information. Such moral urging does not in itself render an accused's statement involuntary but is another circumstance to consider.

■ Even considering these two comments together and in connection with all other circumstances, we are not convinced that appellant's will was overborne. Appellant had already agreed to take the polygraph examination before the examiner commented that the statements could be made for the mutual benefit of appellant and the sheriff's department. Moreover, the ostensible purpose of the polygraph test was to determine appellant's truthfulness about his lack of involvement in the crime. In fact, the stated object of any polygraph examination is not to obtain statements to be used but to determine whether, in fact, the person tested is an appropriate target of investigation. Hence, the polygraph operator's statement that the examination may be for appellant's benefit appears appropriate for that context. In any event, appellant voiced his awareness before the polygraph examination that he would likely fail the test but hoped he would

pass. Appellant knowingly and voluntarily assumed the risk that he would fail the test.

Even if we assumed that a danger might exist that the polygraph operator's "for or against" warning would improperly elicit incriminating statements during the examination that are later used in court, nothing in the record suggests that appellant made any statements during the polygraph examination that he had not already made during interviews. Only after the examination, while the polygraph examiner remained silent, did appellant blurt out that he had "failed" the test. That admission was not in response to interrogation and appellant must have realized that it would not be used to benefit him. Furthermore, it was made after the conclusion of the test, which was the only subject of the "for or against" warning.

As for the comment that appellant would "have" to tell the police the location of the body, Lt. Raney did not promise or threaten appellant in any way when he made the statement. Appellant was simply confronted with the fact that the authorities knew he was guilty. Lt. Raney may have inflated the significance of the polygraph results by telling appellant that he would know whether appellant was guilty after the test. But inflated evidence of guilt is the tactic least likely to render a confession involuntary. *Green v. State,* 934 S.W.2d 92, 100 (Tex.Crim. App.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). The use of such a tactic, which capitalizes on an accused's "moral sense of right and wrong, and his judgment regarding the likelihood that the police have garnered enough valid evidence linking him to the crime," does not cause the accused's will to be overborne because it does not distort "an otherwise rational choice of whether to confess or remain silent." *Id.* Lt. Raney simply used the discovery of appellant's guilt as leverage to urge the appellant to reveal the location of the body. Such a tactic does not deprive an accused of the ability to make a free and rational choice on whether to remain silent. We conclude that the circumstances present in this case do not show that appellant's written statement was involuntary. Points of

error seventeen through nineteen are overruled.

### 2. Closing argument

█ In points of error seven through nine, appellant complains that, during closing argument, the prosecutor referred to facts outside the record. Appellant complains about three different arguments. First, the prosecutor argued that people do not die quickly from strangulation:

> [The medical examiner] also stated that there was significant trauma in [the decedent's] genital area which occurred after she was dead. That means that Eric Nenno strangled her and did what he did for as long as it took. I would submit to you that you don't die quickly from your oxygen being cut off.

(Emphasis and bracket material as added by appellant). Moments later, the prosecutor argued that appellant killed his victim in order to prevent his sexual assault from being discovered:

> How could [appellant] lure [decedent] into the house, have sexual intercourse with her to such an extent that she was literally apart, and then just let her go? That makes no sense at all. Use your common sense. He had to know that once he got her in that [sic] there was nothing he could do but kill her because that was his only hope of getting away with it.

(Emphasis and bracket material as added by appellant). Finally, the prosecutor argued that appellant must have contemplated killing the victim before committing sexual assault:

> [Appellant] knew that if he ever lived out his fantasies, if he ever went through the steps and took the chance to do what he wanted to do, that he was going to have to kill the victim.

(Emphasis and bracket material as added by appellant). Appellant objected to all three arguments. The trial court sustained his objection to the first argument but overruled his objections to the others.

█ We conclude that none of the above arguments were improper references to matters outside the record. First, all of these arguments were simply statements of common knowledge. Common knowledge is an exception to the prohibition against arguing facts outside the record. *Sawyers v. State*, 724 S.W.2d 24, 37 (Tex.Cr.App.1986); *Carter v. State*, 614 S.W.2d 821, 823 (Tex.Cr.App.1981). Second, evidence existed in the record to substantiate the prosecutor's arguments. Appellant's written confession contained a detailed account of appellant's actions in choking the victim:

> I remember her kicking and trying to fight back. I grabbed her up and put my left arm around her neck from behind. I started choking her to keep her quiet. She continued to struggle so I took her into the bathroom in my bedroom with her standing on her feet but with me dragging her. After we got into the bathroom, she stopped screaming but was still struggling. Then she stopped struggling in the bathroom. I think that she was dead.

The jury could have inferred from that account that the victim's death was not immediate. Appellant also discussed with Detective Taber the possible fate of the victim and the killer's motivation for murder:

> Q. Detective Taber, you asked the defendant what he thought had happened to [the victim]?
>
> A. Yes, I did.
>
> Q. What was the response?
>
> A. He said he felt that she was kidnapped, raped, and murdered.
>
> Q. Did he make any statements about why a person would murder her?
>
> A Yes.
>
> Q. What did he say?
>
> A So no one would find out who did it.

(Bracketed material inserted). Points of error seven through nine are overruled.

### C. PUNISHMENT

#### 1. Expert testimony

█ In point of error one, appellant contends that the trial court erred in admitting expert testimony from Kenneth Lanning during the punishment stage of the trial. As explained in connection with point of error two, Lanning testified with regard to appel-

lant's future dangerousness. Appellant contends that Lanning's testimony was inadmissible under Tex.R.Crim. Evid. 702 [7] because it failed to meet the three-pronged test announced in *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992). He also contends that the testimony was inadmissible under Tex. R.Crim. Evid. 403 [8] because it merely duplicated the jury's knowledge and carried the prospect of unduly influencing the jury with an "expert" label.

Appellant contends that the State failed to show the validity of the scientific theories underlying Lanning's testimony or the validity of the method used for applying the theories. Appellant argues that this validity is lacking because the State failed to produce any evidence (1) that the theories underlying Lanning's testimony are accepted as valid by the relevant scientific community, (2) that the alleged literature on the theories supports his theories, (3) that there are specific data or published articles regarding the area of future dangerousness of prison inmates, (4) that his theories have been empirically tested, (5) that he has conducted any studies or independent research in the area of future dangerousness, or (6) that anyone else had tested or evaluated the theories upon which his testimony was based.

In *Kelly,* we held that Rule 702 required the satisfaction of a three-part reliability test before novel scientific evidence would be admissible: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. 824 S.W.2d at 573. Factors relating to this determination of reliability include but are not limited to: (1) acceptance by the relevant scientific community, (2) qualifications of the expert, (3) literature concerning the technique, (4) the potential rate of error of the technique, (5) the availability of other experts to test and evaluate the technique, (6) the clarity with which the underlying theory or technique can be explained to the court, and (7) the experience and skill of the person applying the technique. *Id.*

We subsequently held that this inquiry is substantively identical to the inquiry mandated by the Supreme Court in the federal system in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) concerning the admissibility of scientific evidence under Rule 702. *Jordan v. State,* 928 S.W.2d 550, 554 (Tex. Crim.App.1996). In *Daubert,* the Supreme Court held that Federal Rule 702 required that scientific evidence be "not only relevant, but reliable." 113 S.Ct. at 2795, 125 L.Ed.2d at 481. In determining the reliability of the testimony, the Supreme Court held that a number of factors bear on the inquiry, including: (1) whether the theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error, and (4) general acceptance within the relevant scientific community. *Id.* at 2796–97, 125 L.Ed.2d at 483. The Court emphasized that the inquiry is "a flexible one." *Id.*

■ Although *Kelly* involved novel scientific evidence, we later concluded that the standard established in that case applied to *all* scientific evidence, whether or not it was novel. *Hartman v. State,* 946 S.W.2d 60, 62–63 (Tex.Crim.App.1997). The question we confront today is whether *Kelly* is applicable to *nonscientific* expert testimony (i.e. that involving technical or other specialized knowledge). The answer to that question is a qualified "yes." The general principles announced in *Kelly* (and *Daubert* ) apply, but the specific factors outlined in those cases may or may not apply depending upon the context. We do not attempt, here, to develop a rigid distinction between "hard" science, "soft" sciences, or nonscientific testimony.

**7.** Rule 702 provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

**8.** Rule 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

The present case illustrates that the distinction between various types of testimony may often be blurred. The observations we make today apply to all types of expert testimony.

Courts must keep in mind the statement in *Daubert* that the inquiry is "a flexible one." The general approach of the Federal Rules—and by inference, the state rules that were patterned upon them—was to "relax[ ] the traditional barriers to opinion testimony." 113 S.Ct. at 2794–95, 125 L.Ed.2d at 480. The Supreme Court, while setting out four factors relevant to scientific reliability, cautioned that "we do not presume to set out a definitive checklist or test." *Id.* at 2796, 125 L.Ed.2d at 482. The factors listed were based upon "general observations" about the nature of scientific evidence. *Id.* And, the standard of evidentiary reliability set forth was derived from Rule 702's requirement that the expert's testimony pertain to "*scientific* knowledge" (emphasis added). *Id.* at 2795, 125 L.Ed.2d at 481. While various federal circuits may sometimes purport to disagree with each other, a close examination of the cases shows a general agreement about two important propositions: (1) *Daubert*'s prescription that trial judges act as "gatekeepers" in determining the reliability of expert evidence applies to all forms of expert testimony, and (2) the four factors listed in *Daubert* do not necessarily apply outside of the hard science context; instead methods of proving reliability will vary, depending upon the field of expertise. *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679, 685–689 (5th Cir.1997), *rehearing en banc granted* (general principles of Rule 702 recognized in Daubert apply to other species of expert testimony except where self-evident that the Court's remarks apply only to scientific knowledge; reliability of testimony should be evaluated by reference to the standards applicable to the particular field in question; four *Daubert* "factors" apply to hard science but not to clinical medicine); *United States v. Jones*, 107 F.3d 1147, 1156 & 1158 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997)("gatekeeper" and reliability language applicable; but four factors discussed regarding scienti-

fic validity should not be extended beyond the scientific realm); *Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997)(*Daubert* framework applies to social sciences, but "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary"). *See also, Freeman v. Case Corp.,* 118 F.3d 1011, 1016 n. 6 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 739, 139 L.Ed.2d 676 (1998)("where an expert relies on his experience and training and not a particular methodology to reach his conclusions" *Daubert* "analysis" is inappropriate); *United States v. Bighead,* 128 F.3d 1329, 1330 (9th Cir.1997)(Daubert's tests for admissibility "do not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory"); *Compton v. Subaru of America,* 82 F.3d 1513, 1518 (10th Cir.1996), *cert. denied,* .—— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996)(four factors "applicable only when a proffered expert relies on some principle or methodology" rather than experience or training).

When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method, *Kelly*'s requirement of reliability applies but with less rigor than to the hard sciences. To speak of the validity of a "theory" or "technique" in these fields may be roughly accurate but somewhat misleading. The appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field. These questions are merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science. And, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.[9]

9. We do not categorically rule out employing such factors in an appropriate case.

We turn then, to apply this test to Lanning's testimony. Lanning testified that his analysis was based upon his experience studying cases.[10] He did not contend that he had a particular methodology for determining future dangerousness. Research concerning the behavior of offenders who sexually victimize children appears to be a legitimate field of expertise. Through interviews, case studies, and statistical research, a person may acquire, as a result of such experience, superior knowledge concerning the behavior of such offenders. Moreover, Lanning's testimony shows that future dangerousness is a subject that often surfaces during the course of research in this field. And, Lanning testified that he studied in excess of a thousand cases that concerned the issue of future dangerousness in some fashion. His research involved studying solved cases to attempt to understand the dynamics of what occurred. This research included personal interviews with inmates convicted of child sex offenses, examining the inmates' psychological records, and examining the facts of the offenses involved. Appellant complains about the lack of peer review. But the absence of peer review does not necessarily undercut the reliability of the testimony presented here. To the extent that a factfinder could decide that the absence of peer review cast doubt on the credibility of the testimony, such affects the weight of the evidence rather than its admissibility. We find the reliability of Lanning's testimony to be sufficiently established under Rule 702.

As for appellant's Rule 403 claim, the above discussion shows that Lanning's testimony did not merely duplicate the jury's knowledge because Lanning possessed superior knowledge concerning the behavior of offenders who sexually victimized children. We find that the trial court did not err in determining that the probative value of Lanning's testimony was not substantially outweighed by the danger of unfair prejudice. Point of error one is overruled.

**10.** Lanning had been studying the sexual victimization of children for fifteen years full-time and eight years part-time prior to that. He had been with the FBI for over twenty-five years, and had

### 2. Cross-examination

In point of error four, appellant contends that the trial court erred in refusing to grant a mistrial after the prosecutor asked questions based upon an allegedly inadmissible document. In cross-examining Dr. Robert Geffner, one of appellant's expert witnesses, the prosecutor attempted to introduce into evidence a document made by a colleague of Dr. Geffner. The document was an interview with appellant and was one of the materials relied upon by Dr. Geffner in formulating his expert opinion. Appellant objected that the document was hearsay, and the trial court sustained the objection. Later, the prosecutor questioned Dr. Geffner concerning the contents of the document:

PROSECUTOR: Doctor, State's Exhibit No. 99, would you tell the jury generally what State's 99 is?

WITNESS: It's basically him talking about what he remembered from the night of the crime, what he told other people in general.

PROSECUTOR: What did Eric Nenno tell your associate about what he remembered about the night?

Defense counsel objected, and the trial court sustained the objection. No further relief was requested. Later the prosecutor conducted more questioning concerning the colleague's report:

PROSECUTOR: Also on direct examination you said that you considered it extremely important from your standpoint that he began by telling you or began the confession by saying that it was in a dream-like state?

WITNESS: Not to me but to the police officer.

PROSECUTOR: But you attached some significance to those

been assigned to the Behavioral Science Unit of the FBI Academy in Quantico, Virginia for fifteen years.

particular words, the way that he used those words, that he was in a dream-like state when this occurred?

WITNESS: I believe I said that people with frontal lobe problems do sometimes use that terminology when they've passed the threshold. I think it was something along those lines.

PROSECUTOR: But you find it significant then that he used that type of wording in making your assessment of the evidence that you're here to testify about today?

WITNESS: That's one piece of it. There is a lot of data. That's one piece of it, yes.

PROSECUTOR: In the interview that was done by your associate, Mr. Nenno basically gives a different view of what happened than he does in the confession, doesn't he?

Defense counsel then objected, but his objection was overruled. The prosecutor continued:

PROSECUTOR: You can answer.

WITNESS: I believe it was the same idea.

PROSECUTOR: Didn't you tell us that as part of your evaluation that he said that he didn't remember anything about this offense after it happened?

WITNESS: In the interview, yes. Pretty much so.

PROSECUTOR: That he didn't even remember where the body was placed?

Defense counsel objected, the trial court sustained the objection, and, upon appellant's request, instructed the jury to disregard the contents of the document. Appellant's mistrial motion was denied.

■ Appellant contends that the prosecutor's questions were improper and so

prejudicial as to require a mistrial. We first note that appellant requested a mistrial only as to the last question detailed above; he has failed to preserve error with respect to the earlier questions. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996)(plurality opinion), *cert. denied,* —— U.S. ——, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997); *Id.* at 96–97 (Maloney, J. concurring). As for the last question, he obtained an instruction to disregard. Generally, when a witness has not had the opportunity to answer an improper question, an instruction to disregard will cure any harm to the defendant. *Burks v. State*, 876 S.W.2d 877, 902 (Tex.Crim.App. 1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Cooks v. State*, 844 S.W.2d 697, 735 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993); *Ransom v. State*, 789 S.W.2d 572, 585 (Tex.Crim.App.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990); *Turner v. State*, 600 S.W.2d 927, 932 (Tex.Crim.App.1980). The only exception is when the question is so inflammatory that an instruction to disregard could not withdraw the impression from the jurors minds. *See* above citations. The last question did convey appellant's alleged lack of memory, a fact apparently contained in the inadmissible document. However, essentially the same information was elicited in the immediately preceding question, to which there was no objection. Error is defaulted when the same evidence is presented elsewhere without objection. *McFarland v. State*, 845 S.W.2d 824, 840 (Tex.Crim.App. 1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Narvaiz v. State*, 840 S.W.2d 415, 430 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

■ However, even if error had been preserved, we find that the prosecutor's question was proper. Appellant's claim is that the evidence was hearsay. Evidence is hearsay only when it is offered "to prove the truth of the matter asserted." Tex.R.Crim. Evid. 801(d). The question about appellant's statement was not designed to show the truth of the statement contained in the document but to impeach Dr. Geffner by attack-

ing the basis for his opinion. The State wanted to undermine Dr. Geffner's opinion by showing that he relied upon specific statements made by appellant to formulate that opinion despite other information (upon which he also claims to have relied) that showed appellant telling a different story.

Moreover, evidence constituting part of the underlying basis for an expert opinion is admissible upon cross-examination under Rule 705, which states that an "expert may ... be required to disclose on cross-examination, the underlying facts or data" made the basis of his opinion. Tex.R.Crim. Evid. 705(a); *Ramirez v. State*, 815 S.W.2d 636 (Tex.Crim.App.1991). In a very similar situation, a court of appeals has held that the State could impeach a defense expert with out-of-court statements contained in another doctor's report where the defense expert had relied upon a summary of the report in formulating his opinions. *Moranza v. State*, 913 S.W.2d 718, 727–728 (Tex.App.—Waco 1995, pet. ref'd). In the present case, Dr. Geffner claimed to have relied upon the complained of interview. The State was entitled to impeach Geffner with the contents of that interview. Point of error four is overruled.

### 3. Extraneous offense

In point of error six, appellant contends that the trial court erred in admitting a nine-year-old girl's testimony concerning an incident that occurred between her and appellant. The girl testified that she was walking her bicycle in her neighborhood because its chain was broken. Appellant grabbed the bicycle, carried it into the driveway, and fixed the chain. Then he patted the girl on her "butt." The girl testified that appellant's conduct made her feel mad and sad and that she cried. She later told her mother, who called the police. Appellant contends that

this conduct did not constitute an offense and was offered only to inflame the minds of the jury. He claims that the evidence is irrelevant, and that it is unfairly prejudicial under Rule 403.

Evidence regarding a defendant's character is generally relevant at the punishment stage of a capital murder trial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex.Crim.App. 1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). Uncharged misconduct, whether criminal or not, is admissible at this stage. *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex.Crim.App.), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994). The jury could have found the incident to be misconduct on appellant's part, albeit of a relatively mild sort. The fact that an innocent explanation for such conduct may exist affects the weight of the evidence rather than its admissibility.

As for appellant's Rule 403 objection, the "inflammatory" nature of the evidence is that it tended to show that appellant was a child molester. Showing appellant to be a child molester was a perfectly legitimate purpose, and hence, while the evidence was "prejudicial", it was not unfairly so.[11] Point of error four is overruled.

### 4. Magazines

In points of error eleven through sixteen, appellant contends that the trial court erred in admitting into evidence sexually explicit magazines found in a locked file cabinet. In the same file cabinet, law enforcement officials also found the victim's black and white polka dot dress and white panties. Appellant contends that the magazines were irrelevant because they were simply items he possessed in exercising his First Amendment rights.[12] He also contends that

11. Appellant also contends that the child testified to not remembering the incident and relaying only what the district attorneys told her. He bases this contention upon defense questions "You don't remember much about this at all, do you?" and "In fact, you don't know much except what the District Attorneys have told you?" to which the witness answered "no." The latter question is ambiguous: a "no" answer could be interpreted as either agreement or disagreement with the question. And the former question does

not necessarily indicate that the girl did not remember the facts to which she testified. Moreover, on redirect, the girl testified that she previously told prosecutors the same story that she testified to at trial. And she testified that the prosecutors did not tell her what to say but simply asked what happened.

12. Appellant apparently does not make an independent First Amendment argument but simply

the magazines were unfairly prejudicial under Rule 403.

Because the sexually explicit magazines were found within the same locked file cabinet as the victim's clothes, the jury could have concluded that the magazines played a role in motivating appellant to commit the sexual assault. And the jury could have believed that appellant's possession of the magazines in close proximity to the victim's effects was a sign that appellant was sexually obsessed and that this sexual obsession was of the sort likely to lead to further violence. As such, the magazines are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice.[13]

## 5. Argument

■■■ In point of error five, appellant contends that the trial court erred in denying his motion for mistrial when the prosecutor made the following argument during the punishment stage of the trial:

> He came to the conclusion basically that he had blanked out and was not aware of anything that had happened. If that was the real issue, why didn't we hear that on the guilt-innocence stage? If he didn't know right from wrong, that's a defense.

Appellant objected, the trial court sustained the objection, and the trial court instructed the jury to disregard the prosecutor's comment. Appellant contends that this argument distorted the burden of proof in the State's favor and that the error was not harmless. We have found an instruction to

disregard to cure prosecutorial comments more inflammatory than the one that occurred here. *Shannon v. State*, 942 S.W.2d 591, 597 (Tex.Crim.App.1996)(comment outside the record that the defendant was a sociopath); *Hammond v. State*, 799 S.W.2d 741, 748–749 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1076 (1991)(comment that compared the case on trial with other capital murder cases); *Brown v. State*, 769 S.W.2d 565, 567 (Tex.Crim.App.1989)(reference to parole); *Bower v. State*, 769 S.W.2d 887, 906–907 (Tex.Crim.App.1989), *cert. denied*, 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 66 (1992)(comment about lack of remorse that was held to be a comment on failure to testify). The trial court's instruction cured any error. Point of error five is overruled.

The judgment of the trial court is affirmed.

BAIRD, J., joins with note.

OVERSTREET, J., concurs in the result.

PRICE, J., concurs in points of error 17 through 19, and otherwise joins the opinion of the Court.

BAIRD, Judge, joins the judgment of the Court but dissents to the decision to publish. The decision to publish an opinion of the Court should rest on whether the opinion would contribute to the jurisprudence of this State. Because the instant opinion does not make such a contribution, I dissent to the publication thereof. *See, Quinn v. State*, 958 S.W.2d 395, 403 (Tex.Cr.App.1997); *Kirby v. State*, 883 S.W.2d 669, 672 (Tex.Cr.App.1994);

alleges that such materials are logically irrelevant to his future dangerousness. Assuming arguendo that the viewing of such materials were constitutionally protected, that fact does not necessarily exclude their relevance to show appellant's future dangerousness. And, even if we interpreted appellant as making an independent First Amendment claim, he failed to preserve error on that issue by making no objection on First Amendment grounds at trial. *Pondexter v. State*, 942 S.W.2d 577, 585 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997)

**13.** We denied a motion to supplement the record with the magazines. Appellant correctly alleges in his brief that we can on our own motion order the forwarding of such materials. The State contends that the magazines contain numerous photographs of nude females, most of whom are clean shaven in the pubic area and some of whom purport to be young girls. The State further contends that the females are often depicted engaging in sexual acts similar to those appellant described as having fantasized. If the magazines are as the State describes, then their content would make them relevant to show his sexual obsession with children regardless of where the magazines were discovered. However, because a close locational connection between the magazines and the victim's clothes was established, we need not review the magazines' contents to determine their admissibility. We need only assume that the magazines depict nudity or sex in some fashion—which appellant must concede to make a claim of prejudice in the first place.

*and, Pawson v. State,* 865 S.W.2d 36 (Tex.Cr. App.1993). Overstreet, J., concurs in the result. Price, J., concurs in points of error 17 through 19, and otherwise joins the opinion of the Court.