

# IN THE
# TENTH COURT OF APPEALS

## No. 10-22-00143-CV

## IN THE INTEREST OF A.M.P., A CHILD

**From the 74th District Court**
**McLennan County, Texas**
**Trial Court No. 2020-2604-3**

## MEMORANDUM OPINION

Nativeda appeals from a judgment that terminated the parent-child relationship between her and her child, A.M.P. Nativeda complains that the evidence was legally and factually insufficient for the trial court to have found that she committed the predicate acts in Section 161.001(b)(1)(D) (endangering conditions) and (E) (endangering conduct) and that termination was in the best interest of the child. Because we find no reversible error, we affirm the judgment of the trial court.

STANDARD OF REVIEW

The standards of review for legal and factual sufficiency in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25

(Tex. 2002) (factual sufficiency); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009). Sufficient evidence of only one ground and best interest is necessary to affirm a termination judgment. *In re N.G.*, 577 S.W.3d 230, 232-33 (Tex. 2019). Thus, if the evidence is sufficient to find one predicate ground, it is not necessary to address any other predicate ground. *Id.*

## SECTION 161.001(b)(1)(E)

In her second issue, Nativeda complains that the evidence was legally and factually insufficient pursuant to Section 161.001(b)(1)(E). Section 161.001(b)(1)(E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "Endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). The offending conduct does not need to be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Rather, the specific danger to the child's well-being may be inferred from a parent's misconduct alone." *Id*. In determining whether a parent engaged in endangering conduct, the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the result of the parent's acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.). In our endangerment analysis

pursuant to Section 161.001(b)(1)(E), we may consider conduct both before and after the Department removed the child from a parent. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Mental illness or incompetence of a parent, standing alone, will not support a finding under Section 161.001(b)(1)(E); however, if a parent's mental state causes the parent to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can support a termination under Section 161.001(b)(1)(E). *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Nativeda argues that, due to her limited intelligence and mental capacity, she could not have acted "knowingly" and did not have the requisite scienter to support the findings under Section (E). However, scienter is not required for a parent's own acts under Section (E); scienter is required under subsection (E) only when a parent places his or her child with others who engage in endangering acts. *In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g).

The department received a referral that A.M.P., then two years old, was in a home where his parents were using drugs and that was in unsanitary condition. Nativeda was living in a home with some roommates and the father of her unborn child. The father of Nativeda's unborn child appeared to be intoxicated and tested positive for methamphetamines and cocaine in later drug tests. Nativeda had gotten into a physical altercation with one of their roommates earlier that day while A.M.P. was in the residence. The house was filthy, with trash bags, uneaten and decaying food, and

harmful chemicals visible throughout. A.M.P. grabbed a nail off the floor while the investigator was there and put it in his mouth but Nativeda did not do anything in response although she saw it. The investigator went and removed the nail from A.M.P.'s mouth but Nativeda was not concerned about the hazard it presented to the child.

The department attempted to locate a placement for both Nativeda and A.M.P. prior to removal but was unsuccessful. The department was also unable to locate a relative or fictive kin placement for A.M.P., so A.M.P. was removed and placed in foster care. Nativeda worked the services that were ordered by the trial court and completed most of her service plan except for completing therapy, from which she was discharged by two providers for failing to attend.

The primary issue with Nativeda was her low intellectual functioning, which resulted in an expert testifying that Nativeda would never be able to safely parent a child, especially a child with special needs.[1] A.M.P. was diagnosed with autism during the pendency of the proceedings. Nativeda's IQ was 65, and she had difficulties in most aspects of her life which were exacerbated by her inability to function independently. She was receiving SSI due to her disability which was her sole source of income for the majority of the proceedings. She had several different jobs, none of which lasted longer than a few months at the most but did not understand why she could not keep a job.

---

[1] Nativeda complains in her brief that the opinion of the expert should not have been relied upon by the trial court pursuant to *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). However, she did not object on this basis to the trial court, and therefore, this part of her complaint has not been preserved. TEX. R. APP. P. 33.1(a),

Nativeda's lack of understanding of basic safety issues had led to several potentially dangerous situations as well. During the freeze caused by winter storm Uri in February of 2021, she and A.M.P. were hospitalized due to carbon monoxide poisoning from using a generator indoors. Nativeda did not understand the hazards in the home prior to the removal. Nativeda had found a baggie of a white powder which she assumed was drugs in the father of her unborn child's clothing when doing laundry but did nothing about it. During visits with A.M.P., Nativeda would bring unhealthy snacks and candy and allow A.M.P. to eat too much. This led to him throwing up at one visit and at the foster home afterward on multiple other visits. This continued even after it was discussed with Nativeda and ultimately, she was not allowed to bring food to visits because of it. Shortly before the final trial setting, when the caseworker visited Nativeda's fourth residence in the few months since she and the father of her unborn child had split up, Nativeda had left a pot of boiling water on the stove unattended for some time. Nativeda was using the pot to heat the house because the house did not have functional heating. The house did not have smoke or carbon monoxide detectors.

The doctor who performed the psychological evaluation, taught the parenting classes that Nativeda took, and provided therapy to Nativeda until he discharged her due to nonattendance, testified that Nativeda would not be able to be a safe parent due to an inability to improve due to her low intellectual functioning.

Using the appropriate standards for analyzing the sufficiency of the evidence, we find that the evidence of Nativeda's actions and omissions, both before and after the

removal, was legally and factually sufficient for the trial court to have found that she engaged in conduct which endangered the physical or emotional well-being of the child pursuant to Section 161.001(b)(1)(E).[2] We overrule issue two.

Because sufficient evidence as to only one ground is necessary, we do not reach Nativeda's first issue as to Section 161.001(b)(1)(D).

**BEST INTEREST**

In her third issue, Nativeda complains that the evidence was legally and factually insufficient for the trial court to have found that termination was in the best interest of the child. In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicates factors that have been or could be pertinent in the best interest determination. *Id.* There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence establishing one of the predicate grounds under section 161.001(b)(1) also may be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 27-28.

---

[2] As the department acknowledges in its brief, Section 161.003, which is the provision of the Family Code that allows for termination of the parent-child relationship due to mental illness or deficiency, might have been a better basis upon which to seek termination than Section 161.001(b)(1)(E), however, the department did not ask for a finding pursuant to Section 161.003 and the trial court did not terminate on that basis.

A.M.P. was three years old at the time of the trial and there was no question that he loved Nativeda. However, Nativeda was unable to provide a stable home for him. She was unable to hold down any kind of employment. For the majority of the case, and unbeknownst to the department, Nativeda remained involved with the father of her unborn child, even knowing he was a drug user and abused her verbally. After she left the father of her unborn child, she lived in multiple locations, and did not have a written lease in the home she was living in at the time of the trial. The home she was living in did not have heat or smoke or carbon monoxide detectors and had bad flooring in the bathroom. She did not have a driver's license or vehicle although she testified that she previously owned a truck that she drove. Nativeda did not have a specific plan for child care for A.M.P. or the child born during the pendency of the case.

As discussed above, Nativeda did not understand things that were dangerous for the child to be around. Prior to A.M.P.'s removal, Nativeda was in a physical altercation with her roommate while pregnant with her second child and in A.M.P.'s presence and disregarded the presence of drugs in the father of her unborn child's clothing.

Nativeda did not know what the normal temperature for a child was or how to properly treat a child with an abnormal temperature. She overfed A.M.P. at visits which led to him becoming ill on multiple occasions. Although she had taken parenting classes, she could not recall what she had learned in those classes. Nativeda testified that her mother and siblings would assist her with the children if they were returned; however, none of her family testified on her behalf or were seeking placement of A.M.P. with them.

The expert who testified opined that Nativeda would never be capable of safely parenting a child on her own and it would be dangerous for a child to be in her care.

A.M.P. had been in a potential adoptive placement that had recently fallen through, although the department believed that it would not be difficult to find another adoptive placement for A.M.P. who could meet his needs.

Viewing the evidence according to the proper standards for the sufficiency of the evidence and in light of the *Holley* factors, we find that the evidence was legally and factually sufficient for the trial court to have found that termination was in the best interest of A.M.P. We overrule issue three.

CONCLUSION

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
     Justice Johnson, and
     Justice Smith
Affirmed
Opinion delivered and filed August 31, 2022
[CV06]

