In The

Court of Appeals

For The

First District of Texas

____________

NO. 01-99-00911-CR

____________


ALEJANDRO PEREZ, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 232nd District Court

Harris County, Texas

Trial Court Cause No. 790382






O P I N I O N

 Appellant, Alejandro Perez, was charged by indictment with aggravated sexual assault
of a child. A jury found appellant guilty as charged and assessed punishment at 11 years
confinement and a $10,000 fine. We reverse the judgment and remand the cause to the trial
court.


BACKGROUND


 Appellant was charged with digital penetration of the female sexual organ and the
anus of his step-granddaughter, who was six years old at the time. At trial, the first witness
was the complainant, then eight years old, who gave the following testimony: 

 Q Did you go on a trip back in the summer of 1997? 


 A No, I don't remember. 


 . . . . 


 Q Did you go on a trip with your paw-paw back in summer of '97? 


 A Yes, ma'am. 


 Q Is this man here, your paw-paw? 


 A Yes. 


 . . . . 


 Q What kind of vehicle were you in? 


 A I was in a truck. 


 . . . . 


 Q Have you ever been in that truck with him before? 


 A I don't remember. 


 Q Okay. Have you ever been on a long trip with him before?


 A I don't know. 


 . . . . 


 Q And did you stop off one night at a truck stop? 


 A Yes. 


The complainant then testified that the truck stop had a Wendy's restaurant, and she
identified photographs of the truck stop. She also testified that she and her paw-paw were
the only ones on the trip and that, at the truck stop, they slept in the truck. 

 Q When you got to the truck stop, what did you do first? 


 A I don't remember. 


 Q Do you remember if you ate there?


 A Yes. 


 Q Okay. Did you eat before you went to sleep or do you know?


 A I don't know. 


 Q Okay. Do you remember where you went to sleep? 


 A No. 


 Q Did you go to sleep on the floor or on the chair or in the back?


 A I don't know. 


 Q When you went to sleep, do you remember if your paw-paw went to
sleep with you? 


 A I don't remember. 


 Q Okay. Well, what do you recall about what happened? 


 A (Crying.) I don't remember. 


 Q [Complainant] you understand that I'm not going to go away. We're
going to sit here until you're able to talk about it. Okay. 


 A He did something wrong that wasn't suppose to happen. 


 Q And you mean by "he," you mean your paw-paw? 


 A Yes. 


 Q And what did he do to you? 


 A He touched me where he wasn't - - he touched me where he wasn't
suppose to. 


 Q Do you remember what you were wearing? 


 A Yes. 


 Q What were you wearing, . . . ?


 A I was wearing shorts with flowers on it. 


 Q And when he touched you, were you wearing your shorts with your
flowers on them? 


 A Yes. 


 Q Let me show you this doll here. Can you show me on the doll, were
you touched there? 


 A Right there and on behind. 


 Q Right there and right here? When you're talking about right here, what
do you call there? 


 A My private. 


 Q Your private? 


 A (Nods head.) 


 Q And when he touched you, did he touch you on the outside or inside? 


 A The inside. That's all I remember. 


 Q Okay. When he touched you on the inside, did he touch you with his
fingers? 


 A Yes.


 Q And when you're talking about the inside, you're talking about the
inside of your privates? 


 A I don't remember. 


 Q When you pointed to the doll, you indicated where was her privates? 
Point to them. Here? 


 A Right here (indicating) and behind. 


 Q And when he touched you, did he touch you through your clothes or did
he touch you under them? 


 A Through them. 


 Q Through them? And did he touch you through your shorts or under
your shorts? 


 A He was under them. 


 Q Okay. And did he touch you under your panties or over your panties? 


 A I don't remember. 


 Q Okay. When he touched you, you said he touched you inside? 


 A Yes. 


 Q Okay. Could you feel it inside? 


 A Yes. 


 Q And you indicated your privates down here? 


 A Right. 


 MS. CHAPPEL: Let the record reflect she indicated her female sex
organ. 


 THE COURT: Granted. 


 Q (By Ms. Chappel) And the very back of you where did he touch you? 


 A On my bottom. 


 Q Did he touch you inside or outside? 


 A I have no idea. 


 Q Do you remember if you felt him touching you inside your bottom? 


 A Yeah - - no. 


 Q Do you remember talking to me last night about this case? 


 A Yes. 


 Q Okay. Do you remember indicating to me at that time that you
remembered him touching you inside your bottom? 


 A No. 


 Q You don't remember doing that? 


 A (Nods head.) 


 Q Now, when he touched you, did it hurt? 


 A No. 


 Q Did he - - when he touched you, where was he laying? If you're laying
here - - let me get the other dolly. Okay. Show me how they were
laying. Show me how they were laying. 


 A Okay. 


 Q You were laying next to each other like that? 


 A (Nods head.) 


 Q Were you laying side by side? 


 A I don't remember. 


 Q And when he touched you, do you remember how he was laying? 


 A No. 


 Q Okay. Was he laying next to you like that? 


 A I think so. 


 Q Okay. And when he touched you, what did you do?


 A I don't remember. 


 Q Do you know if you rolled away to try to get away from him? 


 A Yes. 


 Q Okay. When did that happen? 


 A I don't know. 


 Q Okay. Do you remember after him touching you what happened? 


 A I think I woke up. I'm not sure. 


 Q You think you woke up. So, when he was doing this, were you laying
there asleep? 


 A Yes. 


 Q And did it wake you up? 


 A A little. 


 Q Okay. And how many times did he touch you? 


 A I don't remember. 


 Q Did he touch you more than once? 


 A I don't know. 


 Q Do you remember telling me last night that he touched you once when
you first went to bed on the front and in the back and once in the
morning in the front and in the back, yes? 


 Q Is that what you remember happening? 


 A Yes. 


 Q So, he touched you on your private and on your bottom both at night
and in the morning? 


 A Yes. 


 Q And when you talk about the bottom, are you talking about this area on
the dolly? 


 A Yes. 


 MS. CHAPPEL: Let the record reflect she identified the anus?


 THE COURT: Granted. 


 . . . . 


 Q And after he touched you, did you take a shower there at the truck stop?


 A Yes. 


 Q And do you remember him putting lotion on you? 


 A Not really. 


 Q So, you don't know if he put lotion on you or not? 


 A No. 


 Q After you left that truck stop, did he ever touch you again? 


 A No. 


 Oscar Morales, a social worker and an investigator for Children's Protective Services,
testified that he contacted appellant by telephone, told him of the complainant's allegations,
and asked to meet him at the Seminole police station for an interview. (1) Appellant agreed to
meet with Morales. At the meeting, Morales again explained the allegations made by the
complainant. Morales described appellant as "very nervous," " sweating," and stuttering. 
Morales testified that appellant said he and the complainant went on a road trip in appellant's
semi truck and that they slept in the truck and showered and ate at a truck stop. According
to Morales, appellant said he put lotion on the complainant's legs after her shower and, while
putting on the lotion, "he could have poked her with his fingers." Morales testified that he
asked appellant if there were any other times this could have happened, and appellant said,
"Well, I did cuddle her at one time. . . . I picked her up from the buttocks, and my fingernails
could have penetrated her then." Morales testified that appellant also said that, when he and
the complainant stopped in Lamesha [sic], Texas, they fell asleep and he could have
"analyses penetrated" her then, too, explaining that there were two possibilities: (1) he could
have been dreaming about fondling his wife and could have fondled the complainant or (2)
the complainant could have fallen off the bed and he could have penetrated her as he tried
to grab her. Morales testified that appellant said he did not remember if he did or did not
penetrate the complainant. When asked whether appellant was denying the allegations,
Morales responded, "I think so, yes." 

 Barbara Razo, the fiancée of another step-grandfather of the complainant, was the
designated outcry witness. She testified as follows: 

 Q In November of '97 did [the complainant] have the occasion to tell you
about something that had happened to her? 


 A Yes. 


 . . . . 


 Q And was it in front of other people, or was it just to you? 


 A It was just to me. 


 Q And how did she strike up the conversation?


 A She asked if she could talk to me. I said yes. She said they were
having a thing in school where they talked about good touches and bad
touches and she had something she wanted to tell me. 


 . . . . 


 Q And how would you describe her demeanor at that time? How was she
behaving? 


 A She was a little apprehensive at first and then she said this to me. I just
listened to her. I didn't know what she was going to do, and she said
that she had something she wanted to tell me. 

 I said, "Go ahead. That's fine." 

 She asked me if I remembered when she went with her paw-paw
on the truck. 

 I said, "Yes, I do." 

 She said, "Yeah that was when he bought her the little Tweety
purse." 

 I said, "Yes, I remember." 

 She said, "Well they had gone there, out of town, in a truck at
night. She had gone to sleep and that while she was sleeping, he pulled
her panties down and touched her bottom." 


 . . . . 


 Q And she indicated to you that Mr. Perez and her were both asleep when
he touched her?


 A She said she was asleep. She didn't tell me what he was doing. She
was asleep and he pulled her panties down and touched her bottom and
then he turned her over and touched her in the front. 


 Q Did she indicate she woke up when he was doing that? 


 A She told me she was awake but she pretended to be asleep because she
was frightened. 


 Q Now, when she's telling you that Mr. Perez touched her, did her
demeanor change at all? 


 A She was very matter of fact about it, but as soon as she told me as soon
as she got the words out, she began trembling. I didn't see it. I asked
her if he had hurt her. 


 Q And what did she say? 


 A He didn't hurt me. 


 . . . . 


 Q And have you had the occasion to talk to [her] about it since then? 


 A Yes. [She] brings it up frequently. 


 Q What does she say to you? 


 A She didn't say specifically. If she sees something on television or
[hears] of someone being hurt, she says my paw-paw did something to
me. My feelings were hurt when that happened to me. Things like that. 


 Appellant testified at the guilt-innocence phase of the trial. He testified that the
complainant made a trip with him from Seminole to Houston to deliver a load of
watermelons. After dropping off the watermelons, he drove to a truck stop to call a broker
to see if he could get another load. They took a nap at the truck stop, and then they ate. 
Appellant testified that, after eating, the complainant took a shower first, and then he
showered. After his shower, he took another nap because he had driven all night. He woke
up at about 11:00 p.m. when someone knocked on the truck door and asked if he was getting
a load in the morning. When he woke up, the complainant was beside him on the bed. He
later testified that, when he heard the knock on the door, he rolled over to open the door and
he could have grabbed her, "but I didn't [sic] anything was wrong." When asked if his nail
might have penetrated the complainant at that time, he said, "I didn't say, 'penetrated.' I put
my hands on her maybe. . . ." 

 When asked whether he put lotion on the complainant's legs after she showered,
appellant said, "I put some on her. I could have gotten close to her. I do have long nails, but
I don't think I got that close. . . ." When asked whether he penetrated the female sexual
organ or the anus of the complainant, he said, "No, sir." Regarding the testimony of Morales,
appellant said, "Well, he stated that I told him I penetrated her. I told him I could have
gotten close with my nails, but I didn't think so. He left that out." Appellant also testified
that, while they were sleeping at Lamesha [sic], there was a storm and the complainant was
afraid. He said, "I was laying on my bunk. She reached over here, and I pushed her up. 
That's the only time I had any contact with her bottoms." 

 On cross-examination, appellant admitted that he told Morales that he "could have
poked" the complainant's vagina when he was putting lotion on her legs and that he could
have grabbed her when someone knocked on the door and woke him up. However, he stated,
"I didn't say, 'penetrated.' I put my hands on her maybe." He also testified that, when they
were in Lamesha [sic], the complainant was sleeping on the floor of the truck's sleeping area
and he was sleeping on the bed when the storm came in. He said the complainant woke him
up and jumped on the bed with him and that he reached back to push her up. When asked
about slipping inside her while putting on the lotion, he said, "I don't think I did, ma'am." 
When asked whether he said he could have penetrated her anus, he responded, "I didn't say
about penetrating. I said I could have touched it." The State elicited the following
testimony:

 Q And you're telling the ladies and gentlemen that you're not sure if you
touched her or not? 


 A I know I didn't touch her. 


 Q Now, you're saying you know you didn't touch her. Didn't you say you
could have? 


 A I don't think it was that close. I could have scratched her with my nails. 


 Q Are you telling the ladies and gentlemen you could have touched [the
complainant]'s vagina?


 A No. 


 Q Isn't it true that's what you told Oscar Morales? 


 A No. 


 Q Isn't it true that's what you told the jury previously when you were
putting lotion on her, you could have touched her?


 A I could have. I don't think I did. 


 Q My question is: Aren't you admitting to the ladies and gentlemen that
you could have touched her vagina when you were putting lotion on
her? 


 A No. 


 Q What about touching her anus?


 A No. 


 Q You're saying you could have, you did or you saying you don't
remember? 


 A I don't think I did. 


 Q You don't think you did. Is that what you're saying but you're not
adamantly denying it? 


 A At the time I was asleep I don't know if I grabbed her or not. 


 Q When you were putting lotion on her, you weren't asleep, were you? 


 A No. 


DISCUSSION


 Appellant's first four issues complain of evidentiary rulings by the trial court. We
review a trial court's rulings on the admissibility of evidence for abuse of discretion. 
Prystash v. State, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). 

1. Statement about polygraph

 In his first issue, appellant contends the trial court erred in failing to sustain the
defendant's objection to the mention of a polygraph examination. Appellant correctly states
the law--that the results of polygraph examinations are inadmissible and that admission, over
objection, of testimony of a defendant's refusal to take a polygraph has been held to be
reversible error--citing Kugler v. State, 902 S.W.2d 594 (Tex. App.--Houston [1st Dist.]
1995, pet. ref'd), and Sparks v. State, 820 S.W.2d 924 (Tex. App.--Austin 1991, no pet.). 
However, in the present case, neither the results of a polygraph examination nor the refusal
to take a polygraph examination is the issue. 

 At trial, during the testimony of Oscar Morales, Morales was asked:

 Q And after you conducted your interview with Mr. Perez, what did you
do next? 


 A I then contacted, I want to say, the Midlands DPS office to try to set up
a polygraph. 


 MR. LOPEZ: Objection, Your Honor, mention of
polygraph. 


 THE COURT: Overruled.


 Q Without getting into any of that information, did you then refer this to
a police agency? 


No further reference was made to a polygraph examination. 

 We agree that the trial court should have sustained appellant's objection to the
mention by the witness of a polygraph examination. However, the mere mention of a
polygraph examination does not automatically constitute reversible error. Peake v. State, 822
S.W.2d 166, 169 (Tex. App.--Houston [1st Dist.] 1991, no writ). Here, the error was
harmless because the witness did not reveal whether a polygraph examination was actually
offered or taken. See id. In addition, there was no further statement regarding a polygraph
examination. 

 We overrule appellant's first issue. 


2. Challenge to credibility of complainant

 In his second issue, appellant contends the trial court erred in denying the defendant
the right to challenge the credibility of the victim. Appellant complains that he was denied
the right to confront his accuser because he was not permitted to question the complainant
about whether she had ever lied or about specific incidents in which she was alleged to have
made false statements. 

 On cross-examination of the complainant, the following occurred: 

 Q Now, have you ever told a lie before? 


 A To my mom. 


 [STATE]: Objection, relevance, Judge. 


 THE COURT: Sustained. 


 Q Do you remember back after this past Christmas, did you ever tell
somebody at school that your parents didn't have any food at the
house? 


 A No, I don't remember.


 Q Did you tell them that or not?


 A I don't remember.


 [STATE]: Objection to relevance to this line of questioning,
Judge. 


 THE COURT: Sustained. 


 In a bill of exception, appellant offered testimony of the complainant's father in which
he said that, to his knowledge, the complainant had not told people at school they did not
have food in their home. He also testified, in the bill of exception, that, on one occasion,
when the complainant was three or four years old, she "had said something about" hearing
or seeing her mother have sex with her boyfriend. This testimony was not admitted before
the jury. 

 Rule 608(b) of the Texas Rules of Evidence provides:

 Specific instances of the conduct of a witness, for the purpose of
attacking or supporting the witness' credibility, other than conviction of crime
as provided in Rule 609, may not be inquired into on cross-examination of the
witness nor proved by extrinsic evidence. 


Tex. R. Evid. 608(b). 


 In Lopez v. State, the Court of Criminal Appeals held that there is no per se exception
to rule 608(b) for sexual offenses. 18 S.W.3d 220, 225 (Tex. Crim. App. 2000). However,
the court recognized that the Confrontation Clause of the Sixth Amendment may require the
admissibility of evidence that would be excluded by the Rules of Evidence. Id. To
determine whether the Confrontation Clause required the admission of such evidence, the
court balanced the probative value of the evidence in question against the risk entailed by its
admission. Id. 

 In the present case, appellant sought to question the complainant regarding two
incidents: (1) whether she told someone at her school that her parents had no food in the
house and (2) whether she told her father that she had seen or heard her mother and her
mother's boyfriend engage in sex. Appellant offered no evidence in his bill of exception
to support his suggestion that appellant told someone at her school that her parents had no
food in the house. In addition, no evidence was offered in the bill of exception to establish
that the complainant's comment about seeing or hearing her mother engage in sex was
untrue. The testimony on these issues was not probative of the complainant's credibility and
does not implicate the Confrontation Clause. 

 The trial court did not abuse its discretion in sustaining the State's objection to these
questions. Accordingly, we overrule appellant's second issue. 

3. Multiple outcry witnesses

 In his third issue, appellant contends that he was improperly convicted on the
testimony of multiple outcry witnesses. Appellant concedes that the testimony of the
designated outcry witness was properly admitted, but challenges the testimony of three
additional witnesses regarding statements made to them by the complainant. 

 To preserve a complaint for appellate review, a party must have presented to the trial
court a timely request, objection, or motion, stating the specific grounds for the ruling
desired, and either the trial court must have ruled on the issue, or the complaining party must
have objected to the trial court's failure to rule. Tex. R. App. P. 33.1. The record reflects
that appellant did not object to the testimony of any of the outcry witnesses. Therefore, the
issue was not preserved for appeal. See Solis v. State, 945 S.W.2d 300, 301 (Tex.
App.--Houston [1st Dist.] 1997, pet. ref'd). 

 We overrule appellant's third issue. 


4. Statements made before Miranda warnings

 In his fourth issue, appellant contends the trial court erred in admitting statements
made by appellant to an investigator for CPS before appellant was given his Miranda (2)
warnings. Appellant argues that the CPS investigator was a "state actor" who saw himself
in "an investigative role for the State." 

 The CPS investigator testified about his interview with appellant without objection. 
Therefore, appellant has not preserved this complaint. See Solis, 945 S.W.2d at 301; Tex.
R. App. P. 33.1. Accordingly, we overrule appellant's fourth issue. 

5. Ineffective assistance of counsel

 In his fifth issue, appellant contends that he did not receive effective assistance of
counsel at the trial level. Appellant argues that trial counsel was ineffective because he
failed to object (1) to testimony by four "outcry" witnesses, which had the effect of bolstering
the victim's testimony; (2) to the testimony of the CPS child interviewer (3) as an expert
regarding the stages and degrees of disclosure and relating them to the present case; (3) to
testimony regarding statements made by appellant before he was given Miranda warnings;
(4) to the appellant's being required to show his hand to the jury; and (5) to the admission
of medical reports containing an assertion that the child was a victim of child abuse. 
Appellant also contends that trial counsel was ineffective in failing to make an opening
statement and in failing to cross-examine the initial outcry witness. 

 The standard of review for evaluating claims of ineffective assistance of counsel is
set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). See
Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); Hernandez v. State, 726
S.W.2d 53, 55 (Tex. Crim. App. 1986); Gamble v. State, 916 S.W.2d 92, 93 (Tex.
App.--Houston [1st Dist.] 1996, no pet.). Appellant must show that (1) counsel's
performance was so deficient that he was not functioning as acceptable counsel under the
Sixth Amendment and (2) there is a reasonable probability that, but for counsel's error, the
result of the proceedings would have been different. Strickland, 466 U.S. at 687, 104 S. Ct.
at 2064; Thompson, 9 S.W.3d at 812; Gamble, 916 S.W.2d at 93. 

 It is the defendant's burden to prove ineffective assistance of counsel. Strickland, 466
U.S. at 687, 104 S. Ct. at 2064; Gamble, 916 S.W.2d at 93. The defendant must overcome
the presumption that, under the circumstances, the challenged action might be considered
sound trial strategy. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; Thompson, 9 S.W.3d
at 813; Gamble, 916 S.W.2d at 93. 

 Appellant does not provide us with adequate record references to support most of his
complaints regarding the alleged ineffectiveness of trial counsel. However, it is clear that
most of his complaints are without merit. The CPS interviewer testified regarding her
qualifications by education and experience in dealing with children who were victims of
sexual abuse. See Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) (listing
appropriate questions to be asked in determining who may be a proper expert witness in areas
outside of hard science). The trial court would not have abused its discretion in overruling
any objection to her testimony as an expert limited to the area of interviewing child victims
of sexual abuse. (4) Likewise, the trial court would not have abused its discretion in overruling
any objection to the testimony of the CPS investigator regarding "pre-Miranda" statements
because the investigator did not conduct a custodial interrogation of appellant. See
Hernandez v. State, 819 S.W.2d 806, 815 (Tex. Crim. App. 1991). Rather, appellant
voluntarily came to the police station for the interview, knowing the accusation against him. 
Appellant's complaints regarding the testimony of the CPS interviewer and the investigator
are without merit because the failure to object to admissible testimony is not ineffective
assistance of counsel. See Burruss v. State, 20 S.W.3d at 179, 188 (Tex. App.--Texarkana
2000, pet. ref'd). 

 Appellant does not inform us of the nature of his objection to being required to show
his hand to the jury. However, we note that being required to exhibit physical characteristics
is not a violation of the privilege against self-incrimination because such demonstrations are
not testimonial. See Holder v. State, 837 S.W.2d 802, 805 (Tex. App.--Austin 1992, pet.
ref'd). 

 Although appellant complains about trial counsel's failure to make an opening
statement or to cross-examine the primary outcry witness, he does not explain how the result
might have been different if counsel had made an opening statement or cross-examined the
witness. Defense counsel often waives opening statements as a matter of trial strategy. See
Davis v. State, 22 S.W.3d 8, 12 (Tex. App.--Houston [14th Dist.] 2000, no pet.). Likewise,
trial counsel may decide not to cross-examine a witness when cross-examination is more
likely to bolster, rather than to impeach, the witness's testimony. See Dannhaus v. State, 928
S.W.2d 81, 88 (Tex. App.--Houston [14th Dist.] 1996, pet. ref'd). The complaints regarding
the failure to make an opening statement and to cross-examine one witness are without merit. 

 Appellant also complains that trial counsel did not object to the admission of the
complainant's medical records. The complainant was examined by a physician on November
25, 1997, approximately three months after the alleged sexual abuse. The records bear the
notation, "Check for possible sexual molestation--Happen in August." Under "History" is
written, 

 Trouble paying attn in class. Alleged sexual molestation by G.F. Story of
rubbing perinium & some sort of penetration--Aug-- Adjustment problems
getting up @ night poor school performance since then. Small child, happy,
well adjusted, very active, alert & bright. 


The report contains no indication of any physical signs of sexual abuse. At the bottom of the
report is written, "Imp: Likely sexual molestation." There is also the notation, "Report to
child protection." The examining physician did not testify at trial. The medical report was
offered at the close of the complainant's father's testimony. Trial counsel stated, "We have
no objections," and the report was admitted. 

 The complainant's medical records were admissible under rule 803(6) as records of
regularly conducted activity and rule 902(10) as business records accompanied by an
affidavit. See Tex. R. Evid. 803(6), 902(10). The only portion of the medical records that
appellant complains about on appeal is "a written assertion that the child was the victim of
abuse." In fact, the records state, "Likely sexual molestation." However, the records could
also be seen as favorable to appellant because they show that there was no physical indication
of sexual abuse and, in addition, the examining physician noted that the appellant was happy
and well-adjusted. Therefore, counsel's failure to object to the admission of the medical
records could have been sound trial strategy. 

 Appellant complains about trial counsel's failure to object to the testimony of three
"secondary" outcry witnesses, arguing that their testimony was hearsay that bolstered the
testimony of the complainant and impermissably testified to the credibility of the
complainant. 

 The three "secondary" outcry witnesses testified before Razo, the designated outcry
witness, gave her testimony. Much of the testimony of the three witnesses was concerning
their observations of the complainant and her demeanor after the events in question. 
However, each of these witnesses testified to statements made by the complainant that should
have, upon objection, been excluded as inadmissible hearsay. See Garcia v. State, 792
S.W.2d 88, 91 (Tex. Crim. App. 1990) (outcry witness must be first person, 18 years old or
older, to whom child makes statement that describes alleged offense; only first person to hear
such statement is allowed to testify); Broderick v. State, 35 S.W.3d 67, 73 (Tex.
App.--Texarkana 2000, pet. ref'd) (before more than one outcry witness may testify, the
outcry must be about different events, and not simply a repetition of same event as related
by victim to different individuals); see also Tex. Code Crim. Proc. Ann. art. 38.072,
§ 2(a)(2) (Vernon Supp. 2002) (statements by child victim 12 years of age or younger
describing sexual offense made to the first person 18 years of age or older are not
inadmissible on the basis of hearsay). Flores, the CPS child interviewer, after testifying
about her educational qualifications and experience and the stages of disclosure of a child
victim of sexual abuse, testified regarding her interview with the complainant as follows: 

 Q And did she indicate to you whether she had been touched on the inside
of her body or on the outside of her body?


 A She indicated it was inside her body. 


 Q And what did she indicate was touched?


 A She stated that she had been touched on her vaginal area . . . . 


 Q And who did she indicate to you did that to her? 


 A Stated it was . . . her step-grandfather. 


 . . . . 


 Q [S]how the jury basically what she was indicating to you [with the
dolls]. 


 A She was indicating digital penetration. 


 Q And do you recall if she told you whether or not it caused her any pain? 


 A Yes, she did. 


 Q What did she say? 


 A She stated that when that was happening to her she had to hold her
breath so she couldn't feel when he was inserting his finger inside the
vaginal and anal area. 


 . . . . 


 Q Are you aware when [the complainant] told her grandmother about the
incident? 


 A She stated it occurred when she was six, and she first disclosed when
she was seven. 


 . . . . 


 Q What did she tell you when you asked her [why she waited so long to
disclose]?


 A She said she was afraid she would get in trouble. 


The interviewer also testified that the complainant's behavior was consistent with other
children who had been similarly abused. 

 Rich, the elementary school counselor, testified regarding her qualifications as a
school counselor, her counseling activities and techniques, and her contacts with the
complainant's mother. She testified as follows about her contact with the complainant:

 Q And once you read the book [Hey, Don't Touch Me That Way] to her,
how did she respond? 


 A After it was over I just said, ". . . have you ever been touched where
your swimming suit should be? . . ." 


 Q And what did she say?


 A Yes.


 Q And did she indicate who had touched her that way?


 A She said at that point her step-grandfather.


 . . . . 


 Q Did she go into any detail about how she had been touched? 


 A Yes, she did. 


 Q And what did she say to you?


 A She told me she had been touched in her private area, and she pointed
to her vaginal area. 


 Q Now, did she indicate when she had been touched, how long ago? 


 A No, she didn't. She just said on a trip, on a trick [sic] back in the
summer. 


The counselor also said she had dealt with other children who had been abused and that the
complainant's behavior was consistent with someone that had been similarly abused. 

 The complainant's step-mother testified regarding the circumstances surrounding the
trip the complainant took with her step-grandfather and the complainant's general behavior. 
She also testified about her discussions with the complainant regarding the alleged sexual
abuse. During that testimony, the following occurred: 

 Q Did she explain at that time what happened to her? 


 A Yes. 


 Q And what did she tell you happened? 


 A She told me that they were sleeping and that he started rubbing her,
pretending like he was digging.


 Q Pretending like he was digging?


 A Yes, he was acting like he was digging while he was rubbing her?


 Q And when you say "digging" you mean digging inside her?


 A Yes.


 Q Did she indicate to you where on her body he penetrated?


 A In her vaginal area.


 Q Did she indicate to you if he touched her bottom?


 A Not at the time. She did mention it later.


 . . . . 


 Q Did she indicate to you that her paw-paw is the one that did this to her? 


 A Yes, she did. 


 Q Did she indicate it occurred on the trip that we have already spoken
about?


 A Yes, she did. 


 . . . . 


 Q And what did [the complainant] tell you [about why she didn't talk to
you about this before then]? 


 A She was afraid she would get in trouble for it. 


 Effective assistance of counsel does not mean counsel that makes no error. See Saylor
v. State, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). In determining whether counsel was
ineffective, we must consider the totality of the evidence and the circumstances of the
particular case. Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. Trial strategy will be
reviewed by appellate courts only if the record demonstrates that the action was without any
plausible basis. Ex parte Ewing, 570 S.W.2d 941, 945 (Tex. Crim. App. 1978). 

 In the present case, three witnesses, in addition to the designated outcry witness,
testified to statements made by the complainant. Flores, the child interviewer, testified to
statements made by the complainant and gave details, while demonstrating with the doll, that
were not available through the designated outcry witness. Rich, the elementary school
counselor, also testified to statements made to her by the complainant regarding being
"touched" by her step-grandfather. The complainant's step-mother testified to additional
details as told to her by the complainant. Trial counsel did not object to any of this testimony
and, in fact, did not make any objection throughout the entire trial except for one objection
to the mention of a polygraph examination. 

 We know of no plausible basis for counsel's failure to make any objection to the
extensive hearsay testimony of the three witnesses. Such testimony had the effect of
impermissibly bolstering the testimony of the complainant and attesting to her credibility. 
Trial counsel should have objected to the hearsay testimony, and, by failing to do so, counsel
was not functioning as acceptable counsel under the Sixth Amendment. See Alvarado v.
State, 775 S.W.2d 851, 854-55 (Tex. App.--San Antonio 1989, pet. ref'd). We therefore
consider the second prong of the Strickland test--whether there is a reasonable probability
that, but for counsel's error, the result of the proceedings would have been different. 
Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. 

 In this case, the primary issue, and perhaps the only one, was the credibility of the
complainant and the appellant. See Miller v. State, 757 S.W.2d 880 (Tex. App.--Dallas
1988, pet. ref'd). After the eight-year-old complainant testified, three witnesses gave hearsay
testimony regarding the alleged sexual assault as told to them by the complainant. Two of
these witnesses--the school counselor and the complainant's step-mother--supplied details
that were not present in the complainant's or the outcry witness's testimony. 

 In light of the extent of the inadmissible hearsay testimony, admitted without
objection, we conclude that appellant has shown a reasonable probability that, but for
counsel's errors, the result of the trial would have been different. We hold that appellant has
met his burden of proving that his trial counsel was ineffective and that he was prejudiced
by counsel's failure to object. Accordingly, we sustain appellant's fifth issue. 

 We reverse the judgment and remand the cause to the trial court. 



 Sam Nuchia

 Justice


Panel consists of Justices Mirabal, Nuchia, and Price. (5)

Do not publish. Tex. R. App. P. 47.

1. Morales testified that he suggested meeting at the police station because CPS does not
have an office in Seminole. 
2. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). In addition to
the Miranda warnings, the Texas statute adds the right to terminate the interview at
any time. Tex. Code Crim. Proc. Ann. art. 38.22 § 2(a)(5) (Vernon 1979). 
3. The child interviewer was employed by Harmony Children's Advocacy Center, which
receives referrals from CPS. 
4. The Texas Court of Criminal Appeals has said, "We would caution trial courts to
ensure that witnesses who purport to be 'experts' on child sexual abuse are duly
qualified as such." Yount v. State, 872 S.W.2d 706, 710 n.6 (Tex. Crim. App. 1993). 
The court cited various authorities for the proposition that there are a few who are
qualified as experts in the field and that courts should ensure that those claiming
expertise in the field are truly qualified. Id. The court went on to say, "Further, the
testimony given should be scrutinized for its probative value." Id. 
5. The Honorable Frank C. Price, former Justice, Court of Appeals, First District of
Texas at Houston, participating by assignment.