

# NUMBER 13-11-00702-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

BILLY JOE HARRIS,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## On appeal from the 24th District Court
## of Jackson County, Texas.

## OPINION

### Before Justices Rodriguez, Garza, and Perkes
### Opinion by Justice Rodriguez

Appellant Billy Joe Harris challenges his conviction for aggravated sexual assault of a disabled person. *See* TEX. PENAL CODE ANN. § 22.021 (West Supp. 2011). By one issue, Harris argues that the trial court erred in excluding his expert's testimony. We affirm.

## I. BACKGROUND

The indictment charged Harris with aggravated sexual assault. Harris entered a plea of not guilty by reason of insanity. In support of his insanity defense, Harris offered the testimony of his expert, Colin Ross, M.D., a psychiatrist.[1] His testimony concerned a dissociative disorder known as dissociative identity disorder (DID), formerly referred to as multiple personality disorder (MPD) or repressed memory. The trial court excluded Dr. Ross's testimony in its entirety.[2] The jury found Harris guilty of the charged offense and assessed his punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine.

## II. EXCLUSION OF EXPERT TESTIMONY

By his sole issue, Harris contends that the trial court abused its discretion when it excluded testimony offered by Dr. Ross, Harris's expert witness in the field of DID. The State asserts that the trial court did not abuse its discretion because Dr. Ross's testimony regarding DID was unreliable and the jury should not have considered it. Harris agrees that the issue to be determined in this appeal is whether Dr. Ross's testimony was reliable.

### A. Standard of Review

---

[1] Harris also offered the testimony of expert Walter Quijano, Ph.D. Dr. Quijano, a psychologist, testified that the defense retained him to examine Harris in order to determine whether Harris was mentally ill and whether a mental illness had anything to do with the charges against Harris. During his examination, Harris talked with Dr. Quijano about "David," whom he described as a rapist and a dog; "Bobby," whom he described as the "mean person who robbed people"; and "Robert," whose function he did not describe. Believing that Harris was referring to other personalities, Dr. Quijano informed Harris's lawyer that he needed an expert who specialized in dissociative identity disorder (DID). As a result, Harris hired Dr. Ross.

[2] In addition to excluding the testimony of Dr. Ross, the trial court limited Dr. Quijano's testimony, to the extent he testified about DID. On appeal, Harris complains that the trial court erred when it excluded Dr. Ross's testimony and when it limited Dr. Quijano's testimony concerning DID. Our analysis regarding the reliability of Dr. Ross's testimony applies equally to the excluded testimony of Dr. Quijano.

2

We review a trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). An abuse of discretion occurs when the trial court's ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if its decision is within "the zone of reasonable disagreement." *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). In determining whether a trial court abused its discretion, we review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Weatherred*, 15 S.W.3d at 542 (citing *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998) (en banc)).

## B. Applicable Law

Rule of evidence 702 provides that an expert may testify on scientific, technical, or other specialized subjects if the testimony would assist the factfinder in understanding the evidence or determining a fact issue. TEX. R. EVID. 702. "The threshold determination in an inquiry into the admissibility of scientific evidence is whether the evidence is helpful to the trier of fact, and for such evidence to be helpful, it must be reliable." *Somers v. State*, 368 S.W.3d 528, 535 (Tex. Crim. App. 2012); *see Coble*, 330 S.W.3d at 299; *Weatherred*, 15 S.W.3d at 542 (citing *Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (en banc) (other citations omitted)). The burden is on the proponent to show by clear and convincing evidence that the offered testimony is sufficiently relevant and reliable. *Weatherred*, 15 S.W.3d at 542.

If the trial court determines that the scientific testimony or evidence is not reliable,

it may exclude it. *See Weatherred*, 15 S.W.3d at 542–43. The Texas Court of Criminal Appeals enumerated the following factors that may affect the reliability of hard science: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en banc); *see Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 590–92, (1993). The field of psychology, however, falls within the ambit of "soft science," not hard science.[3] *See, e.g., Weatherred*, 15 S.W.3d at 542 (explaining that "[t]he 'soft' sciences . . . are generally thought to include such fields as psychology" and discussing the reliability of eyewitness identifications as a soft science). And when the reliability of soft scientific evidence is at issue, the inquiry is somewhat more flexible than the *Kelly* factors applicable to Newtonian and medical sciences. *Coble*, 330 S.W.3d at 273 (citing *Kelly*,

---

[3] Whether DID, the alleged disorder, is properly categorized as a psychological disorder, which we would review as a soft science, or a medical disorder, which we would review as a hard science, is not before us in this appeal. For purposes of this opinion, we will assume without deciding that DID falls within the field of psychology and review it under the more flexible soft-science standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). In this case, the fact that Harris offered a psychiatrist—a medical doctor—as his expert, does not necessarily change the nature of our review to hard science. In fact, the State offered a psychologist as its expert, and neither party challenged the opposing expert's qualifications. Nevertheless, even were we to review it as a hard science, we would reach the same result because, based on the expert testimony before the trial court and the context of this case, we consider many of the *Kelly* hard-science factors as part of our soft-science analysis. *See Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010) (citing *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992) (en banc)); *Nenno v. State*, 970 S.W.2d 549, 561 n.9 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (en banc).

824 S.W.2d at 572–73).

When determining the reliability of soft-science testimony, the trial court must inquire as to whether: "(1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field." *Tillman v. State*, 354 S.W.3d 425, 435–36 (Tex. Crim. App. 2011) (quoting *Weatherred*, 15 S.W.3d at 542 and citing *Nenno*, 970 S.W.2d at 561). Referring to this series of questions as the *Nenno* test, the court of criminal appeals has described this inquiry as "merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science." *Id.* (quoting *Nenno*, 970 S.W.2d at 561). For soft science, "the 'general principles announced in *Kelly* (and *Daubert*) apply, but the specific factors outlined in those cases may or may not apply depending upon the context.'" *Id.* (quoting *Nenno*, 970 S.W.2d at 560). For example, in *Nenno*, the court of criminal appeals explained that the "hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences." 970 S.W.2d at 561. But the court also noted that it did "not categorically rule out employing such factors in an appropriate case." *Id.* at 561 n.9.

## C. Expert Testimony

### 1. Defense Expert Psychiatrist Colin Ross, M.D.

Dr. Ross, a practicing psychiatrist, testified that he attended medical school in Canada and received a Canadian specialty in psychiatry in 1985. Based in a medical school, Dr. Ross worked as a psychiatrist in Canada for approximately six years. He

relocated to the Dallas, Texas area where he "runs a trauma program [in a private hospital] in the Dallas area, 1991 to the present." Dr. Ross testified that he specializes in psychological trauma, "which is bad things that happen to people and their mental health effects," and sub-specializes "in a certain group of symptoms called dissociative symptoms and dissociative disorders." Dr. Ross defined dissociative disorders as "a failure of integration in the normal functions of consciousness, identity, memory[,] and perception." He explained that the five subsections of the dissociative disorders are: dissociative amnesia; dissociative fugue; depersonalization disorder; DID; and dissociative disorder, not otherwise specified. Dr. Ross testified that about half of the people admitted to the Dallas program since 1991 have been diagnosed with DID and half have had other kinds of trauma and problems.

According to Dr. Ross, DID generally involves different identities that take turns being in charge of the body, and one identity may or may not remember what the other is doing. More specifically, Dr. Ross described DID as a disorder where the primary, normal person suddenly switches and someone else comes out, takes over the body, acts differently, and speaks with a different tone of voice. When that entity goes back inside the primary person, the person may have a "fuzzy" memory or no memory of what happened. The person would feel as if the other entity was in control, and the primary person could not stop or start it. According to Dr. Ross, if a personality is committing a crime based on this multiple personality concept, the primary person may or may not understand the wrongfulness of the act.

The defense hired Dr. Ross to examine Harris, offer his opinion in this matter, and testify as a defense expert. Dr. Ross agreed that Harris is suffering from a serious

mental illness or defect, which he described as DID; however, according to Dr. Ross, a diagnosis of DID does not automatically mean that Harris "doesn't understand the wrongfulness of his acts, but it could." Dr. Ross further testified that he was confident that DID is the correct diagnosis for Harris, but said that he "could very well be wrong." On cross-examination, Dr. Ross agreed that repressed memories, multiple personality, and DID are all controversial theories. He also agreed that many of the leaders in the fields of psychology and psychiatry consider these theories to be unreliable "junk science" and that a number of therapists have been sued and prosecuted for abusing patients they treated for DID or MPD.

Dr. Ross explained that DID is categorized in the Diagnostic and Statistical Manual of Mental Disorders (DSM) as a subcategory of dissociative disorders.[4] He testified that the DSM, published by the American Psychiatric Association, sets out all the rules and criteria for making different psychiatric diagnoses. He agreed that the DSM is the accepted treatise for psychological establishments. Dr. Ross characterized the process of publishing the DSM, including its complex structure of committees, as peer review. He explained that, among other things, committee members discuss and review any changes that should be made in the DSM. Dr. Ross testified that he had been a member of the dissociative committee for the DSM.

According to Dr. Ross, when the American Psychiatric Association placed dissociative disorders as a separate section in the 1980 DSM–II and kept dissociative disorders in subsequent editions, it was making an official statement that this is a real and valid disorder, one that is accepted by the scientific and medical community; "there's a

_____

[4] The DSM at the time of trial was the DSM–IV.

7

literature basis for it." In the 1994 DSM–IV, dissociative disorders were again included as a separate section or, as Dr. Ross testified, as a separate diagnosis. Dr. Ross expects it to be the same in the DSM–V. On cross-examination, Dr. Ross testified that a dissociative disorder, such as DID, is only included in the DSM if it has been subjected to a peer review group and a percent of error established.

Dr. Ross also testified that he had published "a little over 150 papers in psychiatric and other professional journals," which he described as peer-reviewed journals. He explained that he had "published a series of papers on dissociative—dissociation in general, dissociative identity disorder in particular in the American Journal of Psychiatry, which is peer-reviewed, it's the official top journal of the American Psychiatric Association." According to Dr. Ross, he "also published a series of books on dissociative disorders with several different publishers." Dr. Ross noted that ten to twelve studies done in seven or eight different countries reported that about 3.5 percent of the general adult patients had a diagnosis of DID on their research interviews.

## 2. State Expert Psychologist Robert Christopher Barden

The State's expert Robert Christopher Barden, Ph.D., received a doctoral degree in psychology and did research for many years on how children and their families cope with stress. Dr. Barden testified that he became interested in how to improve the health care system for children and received a five-year national research award, which he took "to Harvard Law School." He received his law degree in 1992. While there, Dr. Barden was advised to consider "going into the courtrooms and [helping] to get rid of junk science," and in the mid-1990's, he was asked by national experts "to get involved to stop this epidemic of thousands of families that were being damaged by these ideas of so

called multiple personality disorder."

According to Dr. Barden, from 1995 until 1999, he worked with Attorneys General in many states, as well as the F.B.I., to get the licenses of leaders in a MPD (DID) movement revoked. Dr. Barden testified that he and a number of other national experts were engaged in several hundred lawsuits to "essentially shut down the MPD movement." Dr. Barden testified that he also worked with licensing boards and addressed lawyers, psychologists, psychiatrists, and physicians throughout the United States to resolve this matter.

Dr. Barden's testimony emphasized the need for research and for the submission of scientific articles to the official boards of organizations such as the official journals of the American Psychological Association or the American Psychiatric Association. Dr. Barden testified that there have not been any journal articles on DID or MPD from the relevant scientific community—scientists who sit on these editorial boards. According to Dr. Barden, the absence of such evidence is important because testimony about "[articles from the relevant scientific community] should be an important part of any testimony in a legal case like this."

Dr. Barden testified that one of the most significant problems in this area is the mislabeling of the DSM. Disagreeing with Dr. Ross, Dr. Barden described the DSM as a dictionary or catalog that was developed so people would use the same descriptive language in the same manner. In support of his opinion, Dr. Barden discussed an article titled "Protecting the Integrity of the Legal System, The Admissibility of Testimony from Mental Health Experts under Daubert/Kuhn Analyses" and published in the Journal of Psychology, Public Policy, and the Law, which, according to Dr. Barden, is a leading

journal in this particular area. Expounding on the article, Dr. Barden testified that just because something is in the DSM does not mean that it exists or that it is reliable and should be used in a court of law. He emphasized that DSM labels, which he considered only as labels and not theories, may not be generally accepted, even though they are identified in the DSM. Finally, Dr. Barden agreed that no one has ever published an acceptable peer-reviewed article that sets out that every theory in the DSM is acceptable. Rather, Dr. Barden testified that "you have a lot of things in the DSM that are still controversial."

Dr. Barden also emphasized that "the idea of multiple personality disorder is really a pretty bizarre idea," and before the late 1980s, very few people had given any credence to it at all. He noted that MPD was pulled out of DSM and put back, in a slightly different way, as DID. And according to Dr. Barden, the Journal of Dissociation, "the big journal for that group," was shut down and came back under different management. Dr. Barden stated that DID is still highly controversial. To support his position, Dr. Barden discussed and sponsored into evidence a number of peer-reviewed articles, identified by, among other things, journal, title, and author, on subjects that indicate the unreliability of DID. On cross-examination, Dr. Barden testified that "you don't want MPD [DID] in a court-of-law." Dr. Barden explained that he knew "of more famous scientists [who] think [DID is] really dangerous junk science than people [who] think . . . it is credible." Dr. Barden expressed the following: "I don't believe in DID or MPD, I think it's a misdiagnosis, I think it's a mistake."

Dr. Barden also pointed out that he and Dr. Ross seemed to agree that,

multiple personality disorder is controversial, . . . that Dr. Ross himself is

10

controversial, that he has no scientific method for distinguishing what alter [personality] is going in what window on what day, [and] that he has no scientific method for telling whether people are lying to him or not . . . .

In sum, Dr. Barden testified, "[W]e seem to agree that this is a highly controversial part of the psychiatric/psychological world and that a lot of national and world experts consider this to be a dangerous mistake, this whole idea of so-called MPD."

## D.     Discussion

We first address Harris's assertion that the State's arguments and the trial court's exclusion of Dr. Ross's testimony were incorrectly focused on the old *Frye* general-acceptance standard, which is no longer a part of Texas law. *See Frye v. United States*, 293 F. 1013, 1014 (1923) (explaining that the trial court considers whether a novel scientific principle has been generally accepted by the scientific community (the *Frye* standard)); *see also* TEX. R. EVID. 702; *Daubert*, 509 U.S. at 599–89 (holding that rule 702 did not incorporate the *Frye* test because it was at odds with the progressive approach of the federal rules of evidence); *Kelly*, 824 S.W.2d at 472–73 (setting out factors that may affect the reliability of hard science after *Frye*).   We disagree.

It is clear from the State's trial objections that it was challenging the reliability of Dr. Ross's testimony on the basis that DID is not a legitimate field of expertise.   Harris, himself, acknowledges that the question before this Court is one of reliability.   And under the soft-science *Nenno* test, when determining the reliability of Dr. Ross's soft-science testimony, we must inquire into whether his field of expertise—DID—is a legitimate one. *See Tillman*, 354 S.W.3d at 435–36; *Nenno*, 970 S.W.2d at 561.   In other words, it is clear from the record that the State based its reliability challenge, and the trial court, its ruling, not on the *Frye* general acceptance test, but on the first prong of the *Nenno*

11

test—whether the field of expertise is a legitimate one.[5]

Relying on *Hernandez v. State*, Harris also appears to argue that Dr. Ross's experience and training testimony should be the basis for determining the reliability of his testimony. *See* 53 S.W.3d 742, 749 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). However, the Texas Supreme Court has expressed the following regarding experience as a basis for concluding that an expert's testimony is reliable:

> There must be some basis for the opinion offered to show its reliability. Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case. A more experienced expert may offer unreliable opinions, and a lesser experienced expert's opinions may have solid footing. The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed.

*Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998).

A close examination of Dr. Ross's testimony regarding his training and experience reveals that, although Dr. Ross testified that he ran a psychological trauma program, he did not develop the details of his work with patients who were said to have had DID. Dr. Ross testified he had written much on that subject. Yet other than generally stating that he had written a number of papers and published a number of books, Dr. Ross offered no identifying information regarding these writings and publications. He provided no testimony about the specific content of his papers and books that might arguably contain scientific studies or evidence of the validity of DID. Dr. Ross did not identify research, if any, that may have resulted from his work. Finally, although Dr. Ross testified that he

---

[5] Because our analysis under this first prong is dispositive of this appeal, we need not address the remaining prongs of the *Nenno* test—whether the subject matter of the expert's testimony is within the scope of that field and whether the expert's testimony properly relies upon or utilizes the principles involved in that field." *See Nenno*, 970 S.W.2d at 561; *see also* TEX. R. APP. P. 47.1.

12

had been a member of the dissociative committee for the DSM, he did not discuss his DSM committee work in any detail as it related to DID. So while experience alone may provide a sufficient basis for an expert's testimony in some cases, *see id.*, in this case we cannot conclude that Harris established through Dr. Ross's testimony that his experience and training alone provided a sufficient basis for establishing the reliability of his testimony. *See id.*

Furthermore, although our review of soft science is more flexible than a review of hard science, it is apparent, from the context of this case, that a number of the *Kelly* factors are appropriate to consider in our analysis of the legitimacy of the field of DID, a question we must answer to determine the reliability of Dr. Ross's soft-science testimony. *See Nenno*, 970 S.W.2d at 561. We will not categorically rule those factors out. *See id.* at 561 n.9. The *Kelly* factors that are relevant to our analysis in this case include the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the existence of literature supporting or rejecting the underlying scientific theory and technique; and (3) the experience and skill of the person who applied the technique or, in this case, applied the diagnosis of DID, on the occasion in question. *See Kelly*, 824 S.W.2d at 573.

We have already considered *Kelly*'s "experience and skill" factor. *See id.* As to the other factors, the defense expert and the State's expert described the DSM differently. Dr. Ross testified that the DSM was the basic manual of the American Psychiatric Association—a manual that contained the rules and criteria for making the different diagnoses it identified and constituted peer review. Dr. Barden described the manual as a dictionary or catalog for terms or labels that did not require a scientific basis

13

to be included in the DSM and that may not be generally accepted even though they were identified in the DSM. In his opinion, the DSM provided terms so that people would use the same descriptive language in the same manner.[6]

Both experts testified about DID. Dr. Ross described DID as a subcategory of dissociative disorders found in the DSM. According to Dr. Ross, DID generally includes different identities that take turns being in charge of the body. Dr. Ross agreed that Harris is suffering from DID, but explained he "could very well be wrong." He testified that suffering from DID does not automatically mean Harris "doesn't understand the wrongfulness of his acts, but it could." Dr. Barden discredited the basic theory of DID, describing it as a misdiagnosis, a label, a dangerous mistake, and unreliable junk science. Dr. Barden testified that he did not believe in DID and that it was harmful to many of the patients of the psychiatrists who believed such dissociative disorder was a valid diagnosis, as shown by the number of lawsuits filed in an attempt to "essentially shut down the [DID] movement." The experts, in fact, agreed that DID is a highly controversial theory of dissociative disorders.

In addition, Dr. Barden's opinions regarding DID and the DSM were supported by various publications, which he identified in great detail and sponsored to the trial court.[7] In contrast, Dr. Ross offered only general testimony about publications he or others in the area of DID wrote, articles which may have supported his statements that DID is a valid,

_____

[6] We are not offering an opinion regarding the nature of the DSM and its role as a tool in the psychological and psychiatric communities for making mental health diagnoses. We are only outlining what was before the trial court at the time it made its ruling. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 594, (1993); *Coble*, 330 S.W.3d at 272.

[7] Because Dr. Barden's referenced publications were sponsored to the trial court and are part of the appellate record, they play a role in our analysis of the trial court's exercise of its discretion.

peer-reviewed subcategory of dissociative disorders. Dr. Ross offered no testimony regarding the specific, identifying details of these generally referenced publications. And although Dr. Ross testified that studies had been conducted in other countries, he did not discuss the specifics of the studies and the research underlying the tenets he espoused. *See Weatherred*, 15 S.W.3d at 542–43; *see also Jordan v. State*, 950 S.W.2d 210, 212 (Tex. App.—Fort Worth 1997, pet. ref'd) (concluding that the record did not show an abuse of discretion on the part of the trial court in excluding expert testimony on the reliability of eyewitness identifications when the proffered expert witness "failed to mention by name any other person who purports to be an expert in the field or produce or name the studies he relied on to reach his opinions"). Finally, Dr. Ross offered no testimony regarding specific publications that supported his opinion regarding the DSM.

Harris had the burden of proving by clear and convincing evidence that his expert's testimony was relevant *and* reliable and not mere "junk science." *See Weatherred*, 15 S.W.3d at 542. The volume of peer review counter to Dr. Ross's positions is revealing, for as the Supreme Court set out in *Daubert*, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (quoting *United States v. Downing*, 753 F.2d 1224, 1238 (3rd Cir. 1985)). Considering only what the trial court had before it at the time it ruled, which included the testimony of both expert witnesses, *see id.*, we conclude that the trial court could have reasonably concluded that Harris failed to carry

his burden of showing that Dr. Ross's testimony was reliable.[8]  We cannot conclude that the trial court's ruling was arbitrary or unreasonable.  *See Mechler*, 153 S.W.3d at 439.  Its decision was within "the zone of reasonable disagreement."  *See Bigon*, 252 S.W.3d at 376.  We conclude that the trial court did not abuse its discretion when it excluded Dr. Ross's testimony.[9]  *See Coble*, 330 S.W.3d at 272.  We overrule Harris's sole issue.

### III.  CONCLUSION

We affirm the trial court's judgment.

NELDA V. RODRIGUEZ
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
1st day of August, 2013.

---

[8] We express no opinion as to whether testimony as to the other four subcategories of dissociative disorders could be found reliable in other circumstances.

[9] Based on the same analysis, we conclude that the trial court did not abuse its discretion when it limited Dr. Quijano's testimony regarding DID.

16