

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00373-CR
### NO. 02-16-00374-CR

JAMES R. HERNANDEZ                                                          APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

## FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NOS. 1413791D, 1413902D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant James R. Hernandez of continuous sexual abuse of a child under fourteen years of age and retaliation and assessed his punishment at thirty-five years' confinement and two years' confinement, respectively. *See* Tex. Penal Code Ann. § 21.02 (West Supp. 2017), § 36.06 (West 2016). The trial court sentenced Appellant in accordance with the

---

[1]*See* Tex. R. App. P. 47.4.

jury verdicts. In two issues, Appellant contends that the evidence is insufficient to support his conviction for retaliation and that the trial court reversibly erred by allowing the younger complainant's forensic interviewer to testify about coaching and her lack of concern that the younger complainant had been coached. We affirm.

## I.    BACKGROUND FACTS

Appellant moved in with J. (Mother), her sons, and her daughters Mi. (Older Sister) and Ma. (Younger Sister) (collectively, the girls) around July 1, 2014, and began periodically sexually assaulting at least one of the girls.[2] On the evening of September 8, 2014, the day after Appellant allegedly anally raped Younger Sister, she told Mother that Appellant had "made [her] put his weenie in [her] mouth" and that he had threatened to kill her if she told anyone. Mother confronted Appellant, who denied it, grabbed her by the neck, pushed her against a wall, and threatened to kill her and her family if she told anyone. Appellant repeatedly thwarted Mother's efforts to take the children away from the house, but she and the children finally escaped and stayed with a friend overnight. When they returned to the house the next morning, Appellant was gone. Mother and the children did not see him again until his trial.

---

[2]Two of the four acts specified in the count alleging continuous sexual abuse of a child name Older Sister as the complainant, and two name Younger Sister as the complainant. We do not know which two acts the jury relied on to reach its verdict, and Appellant does not challenge the sufficiency of the evidence to support his conviction for continuous sexual abuse of a child.

2

Because she was afraid of Appellant, Mother did not report his assaultive behavior against her or Younger Sister's allegations that he had sexually assaulted her for about six months; Mother then finally told her counselor. Her counselor in turn notified Child Protective Services and the Lake Worth Police Department, and Appellant was ultimately indicted for continuous sexual abuse of a child, lesser-included counts of child sexual abuse, and retaliation.

## II.     RELEVANT PROCEDURAL FACTS

Mother, her elder son, the girls, their forensic interviewers, the sexual assault nurse examiner, Mother's counselor, Mother's friend, the police detective, and Appellant's sister all testified during the guilt-innocence phase of Appellant's trial. Before the testimony of Samantha Shircliff, the Alliance for Children forensic interviewer who interviewed Younger Sister, Appellant requested and received a gatekeeping hearing outside the jury's presence. At the hearing, Shircliff testified about her experience and training, peer-review participation, and knowledge of up-to-date research relevant to forensic interviews of children alleging sexual abuse. She also testified generally about coaching and stated that during the interview, she had no concerns that Younger Sister had been coached; Appellant objected on reliability grounds to the admission of this testimony before the jury. His objection was overruled.

## III.     SUFFICIENCY OF THE EVIDENCE TO SUPPORT RETALIATION

In his first issue, Appellant contends that the evidence is insufficient to support his retaliation conviction.

3

**A.** **We Review the Evidence in the Light Most Favorable to the Verdict.**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

4

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

**B.    A Jury Can Infer a Defendant's Retaliatory Intent from His Words and Behavior.**

Section 36.06 of the Texas Penal Code provides in relevant part:

(a)    A person commits an offense if the person intentionally or knowingly . . . threatens to harm another by an unlawful act:

    (1)    in retaliation for or on account of the service or status of another as a:

      . . .

    (B)    person . . . who the actor knows intends to report the occurrence of a crime.

Tex. Penal Code Ann. § 36.06.  A person's intent to retaliate may be inferred from circumstantial evidence, such as his acts, words, or conduct.  *Brock v. State*, 495 S.W.3d 1, 16 (Tex. App.—Waco 2016, pet. ref'd); *In the Matter of B.P.H.*, 83 S.W.3d 400, 407 (Tex. App.—Fort Worth 2002, no pet.).

The Texas Court of Criminal Appeals has explained the policy behind the statute:

A central purpose of the retaliation statute is to encourage a specified class of citizens—which includes public servants, witnesses, prospective witnesses, and informants—to perform vital public duties without fear of retribution. Those public duties may include reporting criminal activities, testifying in official proceedings, or cooperating with the government in a criminal investigation. The Legislature keeps increasing that statutorily protected class to ensure that all of those who participate in the administration of justice may do so without fear of harm or physical injury. In *Jones v. State*, this Court held that the word "witness" in the retaliation statute refers only to a person who has already testified in some official proceeding. This holding left a large number of citizens who had or were expected to assist the criminal and civil justice systems outside the scope of protection. Therefore, in 1983, the Legislature amended the retaliation statute to include a "prospective witness" within the protected class, and, in 1989, it extended protection to "a person who has reported the occurrence of a crime." The Legislature again expanded the statutory protections afforded this class of citizens by adding "or one who the actor knows intends to report" to the phrase "a person who has reported the occurrence of a crime" in 1993. Finally, in 1997, it added the alternative of "status," as well as "service," as a member of any one of the protected categories. Thus, the [L]egislature has attempted to account for every category of person who might possess information regarding criminal activity which may lead to the apprehension of a criminal offender. We can conceive of no existing gap in the persons protected under section 36.06.

*Cada v. State*, 334 S.W.3d 766, 771–72 (Tex. Crim. App. 2011) (citations and selected internal quotation marks omitted).

## C. The Evidence Sufficiently Supports Appellant's Retaliation Conviction.

Appellant concedes that Mother's "and Older Sister's testimony established that [he] threatened to harm [Mother] by an unlawful act[,]" but he contends that "there is no evidence . . . that [when he] threatened her, [Mother] intended to report the occurrence of a crime, much less that [he] *knew* she

6

intended to report the occurrence of a crime."  We disagree.

Older Sister testified that after Younger Sister made her outcry to Mother and Mother verbally confronted Appellant, he grabbed Mother by the neck, pushed her against the wall, and said, "If you ever tell anybody, then I'm going to come after you and your family and kill them."

Mother testified:

- Appellant said, "I'll kill you, and you know I will, and no one is going to believe you";

- Mother believed Appellant and thought he was threatening her so she "wouldn't say anything";

- When Appellant repeatedly blocked Mother and the children from leaving the house on the night of Younger Sister's outcry to Mother, Mother assured him that they would not say anything:  "Just let us go[;] we won't tell";

- Mother did not call the police and report Appellant's child sexual abuse that evening because she was afraid of Appellant and his family;

- Mother "th[ought the girls] knew not to say anything because they were scared.  They didn't want to die";

- Mother thought "if nobody knew, [her family] would be okay";

- Mother reported the child sexual abuse to her counselor about six months after Younger Sister's outcry;

- When Appellant was arrested, Mother and her children went to stay in a hotel for about a week; and

- Mother was scared when she told her counselor and still scared at trial.

Mother's counselor testified that Mother was scared when she reported the child sexual abuse in counseling, and the Lake Worth Police Department detective in

7

charge of the case similarly testified that Mother was scared when the investigation began.

Viewing the record in the light most favorable to the verdict, the jury could have inferred that Appellant threatened to kill Mother and the children so she would not report him to authorities. That is, the jury could have inferred that Appellant knew that Mother would report him for sexually abusing Younger Sister and that he threatened her to prevent her from doing so. *See, e.g.*, *Goode v. State*, No. 03-10-00254-CR, 2011 WL 477038, at *5–6 (Tex. App.—Austin Feb. 9, 2011, no pet.) (mem. op., not designated for publication); *Cardenas v. State*, No. 05-08-01210-CR, 2009 WL 2973664, at *3–4 (Tex. App.—Dallas Sept. 18, 2009, no pet.) (mem. op., not designated for publication); *Burroughs v. State*, Nos. 03-07-00424-CR, 03-07-00425-CR, 2008 WL 3540054, at *4–5 (Tex. App.—Austin Aug. 13, 2008, no pet.) (mem. op., not designated for publication).

That Appellant's threat was effective for several months does not affect the analysis of the facts at the time he issued it; neither Mother's state of mind nor her reaction to his threat is an element of the offense of retaliation. *See Penson v. State*, No. 03-07-00549-CR, 2009 WL 416470, at *3 (Tex. App.—Austin Feb. 19, 2009, no pet.) (mem. op., not designated for publication); *Pollard v. State,* 255 S.W.3d 184, 189 (Tex. App.—San Antonio 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009). Accordingly, we hold that the evidence is sufficient to support Appellant's retaliation conviction, and we overrule his first issue.

## IV.    EXPERT TESTIMONY

In his second issue, Appellant contends that the trial court abused its discretion by allowing forensic interviewer Samantha Shircliff to testify (1) about coaching generally and (2) that during her interview, she had no concerns that Younger Sister had been coached.  Appellant contends that Shircliff's testimony is unreliable because (1) the underlying facts do not provide a sufficient basis for Shircliff's opinion and (2) her testimony does not properly rely on or apply the principles of her field.  Appellant bases his arguments on Shircliff's failure to ask direct, introductory questions and similarly specific follow-up questions of Younger Daughter regarding whether she had been coached.

### A.    We Review a Trial Court's Ruling that Expert Testimony Is Admissible for an Abuse of Discretion.

We review a trial court's reliability determination of expert testimony for an abuse of discretion.  *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

### B.    The Party Offering Expert Testimony Must Prove that It Is Reliable and Relevant.

Rule 702 governs the admission of expert testimony.  *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).  It provides that a witness qualified as an expert "by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Tex. R. Evid. 702.  The party proffering the evidence

9

must show by clear and convincing evidence that the expert testimony is sufficiently reliable and relevant to help the jury reach an accurate result. *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).

Rule 705(c) provides that "[a]n expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion." Tex. R. Evid. 705(c). To establish the reliability of expert testimony in a soft-science context like this one, the State must prove that (1) "the field of expertise is . . . legitimate"; (2) "the subject matter of the expert's testimony is within [that field's] scope"; and (3) "the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

**C.** **The Trial Court Did Not Abuse Its Discretion by Determining that Forensic Interviewer Samantha Shircliff's Testimony Was Reliable or by Admitting Her Testimony.**

**1.** **The Trial Court Held a Voir Dire Hearing to Determine the Admissibility of Shircliff's Testimony.**

The following exchange on coaching occurred between the prosecutor and Shircliff during the hearing:

Q. Samantha, are you familiar with the term "coaching"?

A. Yes.

Q. What is coaching?

A. Coaching refers to . . . when a child has been told to say or not to say certain things.

Q. And is coaching and red flags for coaching something that you're trained in as part of your training as a forensic interviewer?

A. Yes. We're trained to ask questions to help the investigators to figure out if there might have been coaching.

Q. In your interviews?

A. Yes.

Q. So are you familiar with some red flags that you are supposed to look for—

A. Yes.

Q. —for coaching?

A. Yes.

Q. And so in your interview with [Younger Sister], were you looking for those coaching red flags?

A. Yes. I would have been asking those kinds of questions.

Q. And based on your training and experience regarding coaching, in your opinion, were there any red flags present?

A. No.

. . . .

Appellant's defense counsel cross-examined Shircliff in the gatekeeping hearing on the coaching issue:

Q. . . . So what specifically—what indicators are you alleging to have seen in the interviews with [Younger Sister]?

A. In the interviews, I can talk about how she had really good peripheral and sensory details. I didn't have concerns for coaching. I utilized my forensic interview protocol, and if I had had any concerns, I would have told the investigators.

Q. What kind of . . . concerns would you normally have in regards to coaching that you speak of?

A. . . . [W]hen we interview children, we are looking for peripheral

11

and sensory details, because sometimes if children can't provide those kinds of details, we might have concerns for coaching, and then at the same time, we might ask if anybody had told them to tell us anything while they're here to talk to us or anybody had told them to lie to us or not say anything to us, those kinds of questions.

Q. Did you ask those specific questions of [Younger Sister]?

A. I don't believe I did ask those specific questions. I would be just referring to her peripheral and sensory details.

Q. So then you wouldn't be able to give an accurate expert opinion in regards to whether or not there's been coaching, since you didn't ask those specific questions in regards to "did someone ask you to lie" and/or follow-up questions regarding "did someone put you up to this." Is that a fair statement?

A. I didn't ask those specific questions, but based on her peripheral and sensory details, I didn't have concerns.

Q. Based on the training that you are relying on to be an expert, aren't those all part of those things that are used to help make that determination?

A. Yes.

Q. It's more than just sensory, being able to describe sensory details, correct?

A. Yes.

Q. And also, . . . since we are outside the presence of the jury, you are aware that she has gone through this . . . kind of thing before, correct?

A. Yes.

Q. Wouldn't that make a difference in regards to her sensory details? She would have a better working knowledge, wouldn't she?

A. It's possible.

Q. So would it be more accurate as well as reliable to ask those follow-up questions, especially in a situation like this?

12

A.      Yes, it probably would have been.

**2.      The Trial Court Ruled Shircliff's Coaching Testimony Admissible Over Appellant's Objections.**

The following discussion with defense counsel, the prosecutor, and the trial court occurred at the end of the voir dire hearing:

| [PROSECUTOR]: | Judge, we would just argue that based on her training and experience, the fact that forensic interviewing, grooming, child abuse dynamics have been recognized by the Court of Appeals in Fort Worth and also the Court of Criminal Appeals, we would argue that she should be qualified as an expert in those topics. |
|---|---|
| | . . . . |
| [DEF. COUNSEL]: | . . . Judge, *I would object to her being able to get into specifics in regards to [Younger Sister] and giving an expert opinion in regards to coaching.*  She just stated herself she did not ask all the necessary questions or the normal protocol that is typically and normally used to make that kind of assessment, especially based on the situation where a young lady has already gone through those things.  She keeps going back and relying on her sensory details, but she has a working knowledge based on her previous experience of going through the situation with CPS as well as the Alliance for Children. |
| THE COURT: | Response? |
| [PROSECUTOR]: | Judge, based on her training and experience, as an expert, she's qualified to testify that based on her training and experience, she didn't notice any of the red flags that she typically looks for when |

13

conducting these interviews.

THE COURT: She can testify to that, and I find that she's also qualified under [rule] 705. I find that the—that her—the scientific theory is valid, is accepted in her community, and I find that she is qualified. I find that there is— and she's testified, too, that there is existence of literature supporting these theories.

So I find the field of expertise is valid. I find that her subject matter that she's going to be testifying on is within the scope of her field, and I find that her testimony relied on the principles in the field. So she can testify to what . . . we talked about outside the presence of the jury.

. . . .

[DEF. COUNSEL]: Judge, before we move on, can I just get a ruling in regards to—*I'm objecting to her specifically testifying as an expert in regards to the coaching dynamics in regards to [Younger Sister] based on her lack of specific and detailed questions that are typically relied upon in this field.*

THE COURT: I said she can testify to that.

[DEF. COUNSEL]: So is it overruled then, Your Honor?

THE COURT: Yes, it is.

[DEF. COUNSEL]: Thank you. [Emphasis added.]

**3. On Direct Examination, Shircliff Testified About Coaching Generally and that She Had No Concerns During the Interview that Younger Sister Had Been Coached.**

In the jury's presence, Shircliff testified as follows on direct examination by the prosecutor:

Q. Are you familiar with the term "coaching"?

14

A.    Yes.

Q.    What is coaching?

A.    Coaching refers to when a child is told to say something or not to say something.

Q.    And do you learn about coaching in the course of your training and experience?

A.    Yes, I do.

Q.    Are you looking for red flags for coaching during your interviews?

A.    Yes.    At some—we ask certain questions to help the investigators decide if there might have been coaching or not.

Q.    What types of questions in general do you ask?

A.    Well, one thing we do look for are peripheral and sensory details.  If the child is able to offer a lot of peripheral and sensory details, oftentimes, that can alleviate some concerns for coaching, but then we also might ask—when we ask, how come you're here to talk to me today, did anybody tell you that you were coming to talk to me today, did anybody tell you to tell me anything today, did anybody tell you not to tell me anything today, different things like that.

Q.    Have you ever interviewed a child where you had concerns that coaching may have possibly occurred?

A.    Yes, I have.

Q.    When you have that situation, what do you do?

A.    I let the investigators know.

Q.    Do you know if a criminal case is filed in every forensic interview that you conduct?

A.    No.

Q.    Do you have any role in deciding whether a criminal case is filed or not?

A.    I do not.

15

Q.     I want to point your attention to March 18th of 2015.  Did you have the opportunity to interview . . . [Younger Sister] on that date?

A.     Yes, I did.

Q.     How old was [Younger Sister] when you interviewed her?

A.     [Younger Sister] was nine years old.

Q.     And have you had an opportunity to review that interview before you testified today?

A.     Yes, I have.

Q.     Did you follow the CornerHouse protocol that you described earlier during this interview?

A.     Yes, I did.

Q.     Was [Younger Sister] able to provide peripheral and sensory details?

A.     Yes, she was.

Q.     Was she able to correct you at points during the interview about things you had gotten wrong?

A.     Yes, she did correct me.

Q.     What was her demeanor during the interview?

A.     She appeared slightly shy, but she maintained the same demeanor throughout the majority of the interview.

Q.     Did you have any concerns for coaching during that interview?

A.     I did not.

**4.     On Cross-Examination, Shircliff Admitted that Follow-Up Questions and Pointed Introductory Questions About Whether a Child Had Been Directed to Tell Her or Not Tell Her Something Are Important.**

The following exchange occurred when defense counsel cross-examined Shircliff:

Q. Ms. Shircliff, in regards to the CornerHouse protocol that you've been talking about and explaining to the jury, . . . is your analysis or your opinion on coaching, is it encompassed in that same protocol, or is it separate?

A. It's not specifically—we learned about it when we learn[ed] about the protocol. We learn[ed] about coaching, yes.

Q. But is it actually included in that CornerHouse protocol or [is] it . . . separate and distinct from the CornerHouse protocol?

A. I wouldn't say it's separate and distinct.

Q. Based on your training and experience, what are the kind of things that you learned to look for in helping you make a determination and reach an opinion regarding coaching?

A. So if a child says somebody touched me and I ask them where it happened, what they were touched with and they can't give those just kind of basic details, that would be a concern. And then I also ask, has anybody told you to say anything about this, has anybody told you not to say anything about this, and based on—if they say that, you know, mom told me to say this, and she told me to lie, something like that, that would be a concern.

Q. So in your field of expertise, these things are all used together to help in making you reach that conclusion or make that determination; would you agree with that statement?

A. Yes, it could be.

Q. So each and every one of those items are necessary, right?

A. They are important.

Q. In this instance, when you were speaking to [Younger Sister], did you ask those follow-up questions or even those introductory questions regarding coaching that you normally would?

A. I didn't ask any follow-up questions. I did ask her why she was there to talk to me and asked her if anybody talked to her about coming to talk to me.

Q. But you did not specifically ask her if anyone had told her to say something or not to say something to you; is that correct?

17

A.   That's correct.

Q.   And you would agree with me that those are important in helping you make that determination whether or not you believe that there is a possibility of coaching, right?

A.   Those could be important, yes.

Q.   And those—that opinion there is— is widely known and widely used throughout your field of expertise; is that correct?

A.   Yes.

. . . .

Q.   And I believe [the prosecutor] had asked you in regards to you don't know what happens—you don't always know what happens after the interview, do you?

A.   No, I don't.

Q.   You also don't have the decision-making power whether to file a case or not to file a case?

A.   No, I do not.

Q.   But you stated that you have had instances where you believed that coaching was apparent or evident, correct?

A.   I would say I have concerns of coaching. I do not make decisions as to whether or not a child has been coached. I don't make any kind of case-making decisions at all.

Q.   Well, I'm not talking about a case-making decision, but if not you—you're the expert here, so if not you, who would make the determination of whether or not they believe coaching was there?

A.   The investigators would, based on not just the interview, but other—other facts that they might find or other interviews and things like that they would have throughout their investigation.

Q.   So then how do you—how do you share your opinion with an investigator regarding an issue or an instance where you believe coaching is a possibility?

A.   After the interview, I would just let the investigator know, you know, I had concerns that she wasn't able to give the kinds of

18

details I would have expected from her development. I have some concerns with maybe a conversation a child had reiterated to me that they had had with a parent. I would just let the investigators know that I had concerns with maybe some of the child's statements that would make me concerned that someone had either told the child to tell me something or not tell me something.

Q.    So then it's safe to say that of these almost 1,000 interviews that you've done, you can tell this jury that children lie even in that type of situation; is that correct?

A.    Yes, children do lie.

**5.    The State Sufficiently Established the Reliability of Shircliff's Testimony on Coaching.**

Appellant does not challenge the State's showing on the first two prongs of the *Nenno* test but argues that the State did not prove that Shircliff's testimony properly relied on or utilized the principles of her field.

Shircliff testified in the gatekeeping hearing:

- She had been conducting forensic interviews for about two and a half years;

- She had undergone extensive training before conducting any interviews;

- She had conducted 885 forensic interviews before the trial;

- She participates in peer review;

- She stays current on "[r]esearch on perpetrator/victim relationships, child abuse dynamics, the disclosure process, those kinds of things";

- She had testified as an expert before;

- Using a protocol helps ensure consistency and best practices and leads to obtaining as much accurate information as possible;

- She knows what coaching means;

19

- She is trained to ask questions and look for "red flags" when interviewing to help investigators make their decisions about whether children are coached;

- She used the CornerHouse Forensic Interview Protocol, which is nationally recognized, when interviewing Younger Sister;

- She saw no red flags and developed no concerns that Younger Sister had been coached because Younger Sister provided sufficient peripheral and sensory details to support her allegations;

- She did not ask Younger Sister "if anybody had told [her] to tell [Shircliff] anything while [Younger Sister was] here to talk to [Shircliff] or [if] anybody had told [Younger Sister] to lie to [Shircliff] or not say anything to [her]"; and

- Given Younger Sister's previous sexual abuse at the hands of a prior boyfriend of Mother's, it probably would have been more accurate and reliable to ask those specific questions.

The record does not establish whether Shircliff knew of Younger Sister's prior sexual abuse at the time of the forensic interview. Regardless, the trial court heard Shircliff's testimony about her experience, the protocol, Younger Sister's grasp of peripheral and sensory details about the alleged offenses, and Shircliff's choice based on her experience and training to forego asking Younger Sister probing questions regarding coaching when Shircliff had not heard anything from Younger Sister justifying them. We therefore hold that the trial court did not abuse its discretion by determining that Shircliff's testimony was sufficiently reliable and allowing her to testify about coaching in general and her lack of concern during the forensic interview that Younger Sister had been coached. *See Jenkins*, 493 S.W.3d at 604–05; *Tillman*, 354 S.W.3d at 437–38; *see, e.g.*, *Rojas v. State*, No. 02-15-00144-CR, 2016 WL 6648748, at *4 (Tex.

App.—Fort Worth Nov. 10, 2016, pet. ref'd); *cf. Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1999) (holding expert's "testimony that the complainant did not exhibit the traits of manipulation" admissible because it "did not constitute a direct comment upon the truth of the complainant's allegations"); *Cantu v. State*, 366 S.W.3d 771, 778 (Tex. App.—Amarillo 2012, no pet.) (holding that asking about indications of coaching is a permissible inquiry of an expert).  We overrule Appellant's second issue.

## V.    CONCLUSION

Having overruled Appellant's two issues, we affirm the trial court's judgments.

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL:  SUDDERTH, C.J.; WALKER and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 9, 2018